# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CANDIDO RODRIGUEZ, Individually and on behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALFI, INC., PAUL ANTONIO PEREIRA, DENNIS MCINTOSH, JOHN M. COOK, II, PETER BORDES, JIM LEE, JUSTIN ELKOURI, ALLISON FICKEN, FRANK SMITH, RICHARD MOWSER, KINGSWOOD CAPITAL MARKETS, REVERE SECURITIES LLC, and WESTPARK CAPITAL, INC.,<br><br>Defendants, | Case No. 1:21-cv-24232-KMW<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION AND OVERVIEW ........................................ 1

II.    JURISDICTION AND VENUE ........................................................ 10

III.   PARTIES ........................................................................... 11

       A.     Plaintiffs ............................................................... 11

       B.     Corporate Defendant ................................................... 11

       C.     Individual Defendants .................................................. 11

       D.     Securities Act Individual Defendants ................................ 13

       E.     Underwriter Defendants ................................................ 14

IV.    SUBSTANTIVE ALLEGATIONS ...................................................... 15

       A.     Background Of Alfi And Its Business .................................. 15

       B.     Alfi's IPO ............................................................... 16

       C.     Shortly After The IPO, Alfi Hypes Its Technology Rollout And Announces
              A $2 Million Share Repurchase Program, Sending Alfi's Stock To
              Its All-Time High ...................................................... 18

       D.     The True State Of Alfi Emerges Over Several Announcements ......... 21

              1.     Defendant Pereira, Defendant McIntosh, And Charles Pereira Are Placed
                     On Paid Administrative Leave And Alfi Commences An Internal
                     Investigation ..................................................... 21

              2.     Alfi Announces The Resignations Of Its Prior Auditors, The Resignation
                     Of Its Audit Committee Chair, And Discloses Further Information Behind
                     Its Decision To Place Its Executives On Leave And To Authorize The
                     Investigation ..................................................... 22

              3.     Shortly Thereafter, Alfi Announces It Is Being Investigated By The SEC
                     And That It Would Be Unable To Timely File Its Quarterly Financial
                     Results ........................................................... 24

              4.     Defendants Pereira And McIntosh Resign From Alfi ................ 25

              5.     Alfi Announces The Conclusion And Findings Of Its Independent
                     Investigation ..................................................... 25

        a)      The Former Executives Caused Alfi To Enter Five Different Corporate Transactions Without The Board's Knowledge Or Approval, And In Multiple Instances, Included The Unauthorized Issuance Of Alfi Common Stock As Part Of The Transaction ..... 26

        b)      The Investigation Determined That Defendant Pereira Made False Representations To The Market And That The Former Executives Accessed And Attempted To Seize Alfi's Computer Systems After Being Placed On Administrative Leave ........................................ 28

        c)      The Investigation Found Alfi's Internal Control Over Financial Reporting To Be Deficient And Recommended Numerous Enhancements To Alfi's Internal Controls ................................... 29

    6.    Alfi Announces That Its Previously Issued Financial Reports Should No Longer Be Relied Upon ............................................................... 31

    7.    Post-Class Period, Alfi Issues Its Restated Financial Results ................. 32

        a)      As Part Of The Restatement, Alfi's Current Management Concluded That A Material Weakness Existed In Alfi's Internal Controls Over Financial Reporting ..................................................................... 34

        b)      Alfi Discloses Receipt Of An SEC Subpoena Relating To The SEC's Ongoing Investigation ........................................................ 35

  E.    Alfi's Registration Statement And Class Period Financial Results Were Not Presented In Accordance With GAAP .................................................................. 35

        a)      Applicable GAAP For Alfi's Intangible Assets............................ 36

        b)      Applicable GAAP For Alfi's Tablets ........................................... 38

V.     VIOLATIONS OF THE SECURITIES ACT .................................................... 40

VI.    VIOLATIONS OF THE EXCHANGE ACT ................................................... 45

  A.    Defendants' Materially False And Misleading Statements And Omissions In Violation Of The Exchange Act ........................................................................... 45

    1.    False And Misleading Statements And Omissions in Alfi's Registration Statement........................................................................................ 45

    2.    False And Misleading Statements And Omissions in Alfi's 1Q 2021 Financial Results........................................................................... 46

    3.    False And Misleading Statements And Omissions During And Following Defendant Pereira's Benzinga Interviews.............................................. 51

4.     False And Misleading Statements And Omissions in Alfi's 2Q 2021 Financial Results ............................................................................................. 52

B.     Additional Allegations Regarding Defendants' Scienter ..................................... 56

1.     Defendant Pereira Has A History Of Engaging In The Types Of Actions Found In Alfi's Investigation ..................................................................... 56

2.     Alfi Tracked Both Rideshare Drivers' Interest In Alfi Tablets As Well As Drivers That Had Signed A Contract With Alfi In A Single Spreadsheet 59

3.     Corporate Scienter Allegations ................................................................. 60

C.     Loss Causation ...................................................................................................... 60

D.     Applicability Of The Presumption Of Reliance (Fraud-On-The-Market Doctrine) .......................................................................... 63

VII.     CLASS ACTION ALLEGATIONS ............................................................................... 65

VIII.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................................................. 67

IX.     CLAIMS FOR RELIEF ................................................................................................... 67

X.     PRAYER FOR RELIEF .................................................................................................. 75

XI.     JURY TRIAL DEMANDED ........................................................................................... 75

Lead Plaintiff Candido Rodriguez ("Plaintiff"), along with plaintiff John K. Allen, on behalf of the Joseph M. Driscoll Trust, and plaintiff Alexander C. Takian (collectively, "Plaintiffs'), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Alfi, Inc. ("Alfi" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Alfi; (c) interviews of former Alfi employees; (d) review of reports issued by industry and securities analysts; and (e) review of other publicly available information concerning Alfi and/or Defendant Pereira.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of all persons and entities that purchased or otherwise acquired Alfi securities between May 4, 2021 and March 11, 2022, inclusive (the "Class Period"), including persons and entities that acquired Alfi common stock and/or warrants pursuant and/or traceable to the Registration Statement issued in connection with the Company's initial public offering on or about May 4, 2021 (the "IPO" or "Offering"), and were damaged thereby. Plaintiffs pursue claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Alfi was founded by Defendant Paul Pereira along with his son, Charles Pereira, and Defendant John Cook, in April 2018. The Company provides advertising-analytics technology through its Digital Out-of-Home advertising platform. Alfi's platform is purportedly able to determine a particular viewer's demographics, geolocation, and emotion of a person in

1

front of an Alfi-enabled device, and then deliver content to that viewer based on their profile. With this information, Alfi is purportedly able to provide advertisers with "real time, accurate and rich reporting on customer demographics, usage, interactivity and engagement[.]"

3. Alfi's initial Form S-1 registration statement was filed with the SEC on January 8, 2021 (as amended on February 9, 2021, March 2, 2021, March 3, 2021, March 17, 2021, March 23, 2021, April 9, 2021 and April 26, 2021), and its Form 424(b)(4) prospectus, incorporated by reference into the registration statement, dated May 3, 2021 and filed with the SEC on May 5, 2021 (collectively, the "Registration Statement"). The Registration Statement was declared effective by the SEC on May 3, 2021 and Alfi shares began trading on May 4, 2021. In the IPO, Alfi sold approximately 4,291,045 shares of common stock and warrants to purchase 4,291,045 shares of common stock at the combined public offering price of $4.15 per share. The Company received aggregate proceeds of approximately $17.8 million from the Offering, and net proceeds of $15.7 million after deducting underwriting discounts and commissions and other offering expenses.

4. Alfi stated in its Registration Statement that its initial focus is to place its Alfi-enabled devices in rideshares and airports. Shortly after completion of the IPO, Alfi announced that it was resuming the rollout of its tablets in rideshares across Miami and other U.S. cities after a delay due to the COVID-19 pandemic. Alfi made a series of announcements in late May and June 2021 indicating that it was on-plan with the rollout, including a June 15, 2021 announcement that it had entered into an agreement with a business "for the fulfillment, staging and shipment of the first 10,000 digital tablets to Uber and Lyft drivers nationwide" and that Alfi had "a massive operation unfolding in Miami today with hundreds of Ubers and Lyfts installing Alfi tablets. It's an epic event and marks the start of our nationwide rollout."

5.      Defendant Pereira also hyped Alfi by frequently speaking with Benzinga, an online trading platform. On June 16, 2021, during a live online show with Benzinga, Defendant Pereira announced that Alfi had over 22,000 Uber and Lyft users "signed up waiting for deployment of Alfi tablets." One week later, on June 22, 2021, Benzinga published an "exclusive" based on an interview with Defendant Pereira, announcing that Alfi was initiating a $2 million stock buyback. Defendant Pereira was quoted: "We will continue to buy back our stock as [a] firm commitment to our company valuation…. Our commitment to a tight float and our retail base is unwavering."

6.      Alfi's announcements of its purportedly successful rollout and share repurchase program quickly skyrocketed Alfi's share price to its all-time high on June 28, 2021, reaching a peak price of $22.50 per share during the day, and closing at $18.59 per share. Warrant holders similarly rushed to execute their warrants: as of June 30, 2021, warrant holders had exercised warrants to purchase 3,385,746 shares of common stock, providing Alfi with just under $15.5 million in additional working capital.

7.      But Alfi's success was short lived. On October 28, 2021, after the market closed, Alfi made the first of a series of announcements that, together, revealed the true state of Alfi as a company with deep-seated internal control issues and with a vastly smaller net worth due to Defendants' overstatement of Alfi's two greatest assets, its technology and its tablets.

8.      In this first October 28, 2021 announcement, Alfi stated that on October 22, 2021, its Board had "placed each of Paul Pereira, the Company's President and Chief Executive Officer, Dennis McIntosh, the Company's Chief Financial Officer and Treasurer, and Charles Pereira, the Company's Chief Technology Officer, on paid administrative leave and authorized an independent internal investigation regarding certain corporate transactions and other matters"

(the "Investigation"). Alfi further disclosed that on October 28, 2021, Charles Pereira's employment with the Company was terminated.

9.      On this news, the Company's shares fell $1.24, or approximately 21.91%, to close at $4.42 on October 29, 2021, damaging investors.

10.      On November 1, 2021, Alfi made several announcements. First, Alfi announced that its previous auditor was going out of business, and that the Company's newly hired replacement had resigned on October 29, 2021.

11.      Second, Alfi announced that the Board had received a letter via email from Defendant Richard Mowser, a director of the Company and its Audit Committee chair, resigning from the Board effective immediately. In his letter, Mowser stated that he decided to resign based on the Board placing Defendants Pereira and McIntosh on leave and firing Charles Pereira – calling these actions "personal and calculated." Mowser stated in his letter that he believed the Board "acted precipitously in absence of any written policies nor governance committee in operation and no written warning or communication to any of these chiefs regarding any action/actions that may have concerned any Board member at any point in time[.]" Mowser did acknowledge that "there may be concerns as to the actions of the CEO in the allegations raised," but called the replacement of Alfi's executives a "fait a compli."

12.      Third, Alfi explained that two separate corporate transactions precipitated the Board's decision to place the executives on leave and to authorize the Investigation. The first transaction was the Company's purchase of a condominium for $1.1 million in Miami Beach, Florida and the "related erroneously certified corporate resolution regarding the unanimous approval by the Board and the Company's stockholders of such purchase." The second transaction was Alfi's commitment to sponsor a sports tournament for $640,000, a portion of

which was payable through issuance of unregistered shares of Alfi's common stock. Alfi explained that these two transactions were undertaken by Alfi's management "without sufficient and appropriate consultation with or approval by the Board."

13.     Then, on November 15, 2021, after the market closed, Alfi announced that on November 9, 2021, the Company received a document preservation letter from the SEC because Alfi may have documents and data relevant to the SEC's ongoing investigation into the condo purchase, the sports tournament sponsorship, and Alfi's financial reporting and disclosure controls.

14.     In addition, on November 16, 2021, Alfi stated that it was unable to timely file its quarterly report on Form 10-Q for the period ended September 30, 2021 due to the recent changes in its executive management and its Board and due to Alfi not yet engaging a new independent public accounting firm to review the 3Q 2021 financials.

15.     On all this news, Alfi's stock price fell $0.24, or 5.21%, to close at $4.37 per share on November 16, 2021, damaging investors.

16.     On February 3, 2022, after a couple of quiet months, Alfi announced that Defendants Pereira and McIntosh had resigned, effective February 2, 2022.

17.     Just a few weeks later, on February 23, 2022, Alfi announced the results of its independent Investigation. The Investigation's findings include:

- Alfi's "former senior management" caused Alfi to purchase a condominium in Miami Beach, Florida for approximately $1.1 million without the Board's knowledge or approval. Specifically, Defendant Pereira "signed a certification filed with Miami-Dade County which incorrectly stated that the Board and the Company's stockholders approved the purchase." Moreover, the Investigation found that that the condominium was transferred to a newly formed limited liability company controlled by Defendants Pereira and McIntosh without the Board's knowledge or approval.

- Alfi's "former senior management caused" Alfi to enter into an agreement to sponsor a sports tournament for two years for a $640,000 sponsorship fee, half of which was paid in

cash, and the other half of which was paid through the issuance of 31,638 shares of Alfi common stock. As with the condominium purchase, this sponsorship agreement was executed, and the fee paid, without the Board's knowledge or approval. The Investigation found that Defendant McIntosh signed a certification to Alfi's transfer agent which stated (incorrectly) that the issuance of this common stock was authorized by the Board.

- Alfi's "former senior management" caused Alfi to enter into agreements with three vendors: (1) an investor relations firm to provide investor relations and strategic consulting services and capital introductions. Alfi paid this investor relations firm $808,000, approximately $700,000 of which was in addition to amounts required under the agreement and issued 150,000 shares of common stock to the investor relations firm; (2) a consultant to provide financial and business advice. Under this agreement, Alfi issued the consultant 150,000 shares of common stock, even though the Investigation could not determine, what, if any, services were provided to Alfi; (3) a start-up call center to provide customer service, sales, and onboarding services. Under this agreement, Alfi was to pay for commission-based compensation and to reimburse pre-approved costs or expenses. Alfi noted that minimal commissions were earned, but that $343,642 was paid to this vendor despite the lack of evidence that expenses were pre-approved by Alfi. The issuance of common stock to both the investor relations firm and the consultant were issued without the Board's knowledge or approval. Again, Defendant McIntosh "signed certifications to the Company's transfer agent which incorrectly stated that such issuances were authorized by the Board."

- Defendant Pereira's statement made to Benzinga on June 16, 2021 that Alfi had 22,000 rideshares "signed up" was false and misleading. "[A]t such time, such number of drivers had expressed interest in applying to secure contracts with the Company and, in June 2021, 1,253 drivers had contracts with the Company. Such statement was made without the Board's knowledge or approval."

- Defendant Pereira's disclosure to Benzinga of a $2 million stock buyback plan was made without the Board's knowledge or approval, and the Board *subsequently* approved the share repurchase program the following day.

- Social media posts, that have since been removed, were made from an account on Defendant Pereira's computer, that did not identify him or Alfi. Certain of these social media posts touted Alfi and its prospects, and some included inaccurate statements about Alfi.

- After Defendant Pereira, Defendant McIntosh, and Charles Pereira were placed on leave and were instructed to not access Alfi's computer systems or platforms: (i) Charles Pereira (a) took control of, and prevented Alfi from administering, its Google Workspace (including the Company's email accounts, calendars, contacts, chats and saved files) and its Amazon Web Services (which hosts tablet data and provides a platform for Alfi's software development), and (b) obtained from Google downloadable access to all the data maintained in Alfi's Google Workspace; and (ii) Defendants Pereira and McIntosh accessed and downloaded files from Alfi's Google Drive.

18.     The Investigation also found Alfi's internal control over financial reporting to be deficient with respect to: (1) the disbursement process for third-party vendors; (2) the review and approval process for significant vendor contracts; (3) the use of the Company credit card by executives; (4) the supervision and approval of travel and entertainment expenses incurred by executives; (5) segregation of duties for the payment and recording of invoices and related bank reconciliations; (6) the lack of a sufficient accounting manual; and (7) guidelines for the capitalization of fixed assets.

19.     The Investigation's findings also included ten recommendations to enhance Alfi's internal controls over financial reporting, including, among others: (1) maintaining the proper "tone at the top;" (2) establishing segregation of duties across all aspects of financial operations; (3) developing a comprehensive accounting manual; (4) performing a fixed asset audit; (5) establishing a review and approval process for entering into significant vendor contracts; and (6) retaining a consulting firm that specializes in internal control implementation and design to assist Alfi in enhancing its internal control over financial reporting.

20.     Alfi further noted in their February 23, 2022 announcement that its current management was still in the process of evaluating the issues and findings of the Investigation and assessing Alfi's internal controls over financial reporting, as well as determining whether a restatement of Alfi's previously issued financial statements was necessary.

21.     Then, on March 11, 2022, after the close of market, Alfi announced that its previously issued audited results for the years ended December 31, 2019 and 2020, included in Alfi's Registration Statement, and the Company's previously issued quarterly financial statements on Form 10-Q for the quarterly periods ended March 31, 2021 and June 30, 2021 should no longer be relied upon and should be restated as a result of the following identified

800915.2

accounting errors:

a.      Alfi incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021. This resulted in an overstatement of intangible assets. As Alfi explained in its Registration Statement, its intangible assets balance is comprised of the capitalized costs associated with the creation of its technology.

b.      Alfi overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

c.      Alfi overstated total assets and total liabilities as of December 31, 2020, by incorrectly recording a note receivable from related parties that was executed in December 2020, but not fully funded until April 2021.

d.      Alfi did not recognize and report on its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021, an office lease in accordance with Financial Accounting Standards Board Accounting Standards Update No. 2018-11, Leases (Topic 842).

22.      Alfi explained that although the effects of these errors on net income and total stockholders' equity (the Company's net worth or book value) was still being determined, it preliminarily expected that Alfi's total stockholders' equity balances would decrease by $1.5 million as of December 31, 2019, by $2.9 million as of December 31, 2020, and by approximately $3.0 million as of June 30, 2021.

23.      Alfi also stated that it expected to conclude that material weaknesses in its

8

internal controls over financial reporting for the periods covered by these accounting errors and that Alfi's disclosure controls and procedures for such periods were not effective.

24.     On all this news, Alfi's stock price fell $0.13, or 8.075%, to close at $1.48 per share on March 14, 2022, the first trading day after this news was released, damaging investors.

25.     Finally, on May 16, 2022, after the end of the Class Period, Alfi issued its restated financial results to correct the four accounting errors announced on March 11, 2022. The restatement also included a number of additional accounting adjustments that were not explained in the restated financials.

26.     As a result, not only were Alfi's intangible asset balance (*i.e.*, its technology) and its tablet balances massively reduced, but the stockholders' equity in the Company, *i.e.*, Alfi's net worth or book value, decreased each period by millions of dollars and in larger amounts than Alfi previously anticipated. Alfi's reported net income for 2019 and 2020 also decreased.

27.     Alfi's current management also concluded that its internal controls over financial reporting were not effective and that a material weakness exists in Alfi's internal controls over financial reporting. Management concluded that these material weaknesses arose because, "as a pre-revenue private company recently formed," Alfi did not have the "necessary personnel to design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company."

28.     Also in connection with the restatement, Alfi disclosed that on March 8, 2022, the Company received a subpoena from the SEC relating to the SEC's ongoing investigation.

29.     Based on Alfi's voluminous admissions and remedial actions, it is well-nigh indisputable that Alfi's Registration Statement, quarterly reports on Form 10-Q for March 31,

2021 and June 30, 2021, and certain of Defendant Pereira's statements all included materially untrue statements or omissions of material facts. As a result, the market value of Alfi's common stock and warrants significantly declined and Plaintiffs and other Class members have suffered significant losses and damages. Accordingly, Plaintiffs seek to pursue claims under Sections 11 and 15 of the Securities Act and Sections 10(b) and 20(a) under the Exchange Act against Defendants.

## II.     JURISDICTION AND VENUE

30.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

32.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

33.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.    PARTIES

#### A.    Plaintiffs

34.    Lead Plaintiff Candido Rodriguez, as set forth in the previously-filed certification filed with the Court (Dkt. No. 11-4), incorporated by reference herein, purchased Alfi securities during the Class Period and pursuant and/or traceable to the IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

35.    Plaintiff John K. Allen, on behalf of the Joseph M. Driscoll Trust, as set forth in the previously-filed certification filed with the Court (Dkt. No. 12-4), incorporated by reference herein, purchased Alfi securities during the Class Period and pursuant and/or traceable to the IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

36.    Plaintiff Alexander C. Takian, as set forth in the previously-filed certification filed with the Court (Dkt. No. 12-4), incorporated by reference herein, purchased Alfi securities during the Class Period and pursuant and/or traceable to the IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

#### B.    Corporate Defendant

37.    Defendant Alfi is incorporated under the laws of Delaware with its principal executive offices located in Miami Beach, Florida. Following the IPO, Alfi's common stock trades on the NASDAQ Exchange ("NASDAQ") under the symbol "ALF" and its warrants under the symbol "ALFIW."

#### C.    Individual Defendants

38.    Defendant Dr. Paul Antonio Pereira ("Pereira") was the Company's Co-Founder,

800915.2

Chairman, President, and Chief Executive Officer ("CEO") from Alfi's founding in 2018 until his resignation from all his positions held on February 2, 2022. Prior to his resignation, on October 22, 2021, Defendant Pereira was placed on paid administrative leave. Before Alfi, Defendant Pereira served as the CEO of several companies, including Alton Consulting Group, Meridian Holdings Group. Inc. and MHG (now known as Danimer Scientific), and Uniwell Labs, and was a professor at ISEG Business and Finance School where he taught graduate level business courses. Defendant Pereira signed the Registration Statement. In addition, Defendant Pereira signed the following Class Period financial statements and the related Sarbanes-Oxley Certifications: 1Q 2021 Form 10-Q filed with the SEC on June 10, 2021; and the 2Q 2021 Form 10-Q filed with the SEC on August 16, 2021.

39.     Defendant Dennis McIntosh ("McIntosh") was the Company's Chief Financial Officer ("CFO"), serving as Alfi's principal financial and accounting officer, from October 2020 until his resignation on February 2, 2022. Prior to his resignation, on October 22, 2021, Defendant McIntosh was placed on paid administrative leave. Since 2019, McIntosh has served as the managing partner at Prosperity Partners Consultancy, LLC, and previously served as a partner at B2B CFO Partners, LLC. McIntosh also served as the CFO of Success Academy Charter Schools Inc., and is a certified public accountant ("CPA"). McIntosh signed the Registration Statement. In addition, McIntosh signed the following Class Period financial statements and the related Sarbanes-Oxley Certifications: 1Q 2021 Form 10-Q filed with the SEC on June 10, 2021; and the 2Q 2021 Form 10-Q filed with the SEC on August 16, 2021.

40.     Defendants Pereira and McIntosh (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities

analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Alfi's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements herein.

### D.     Securities Act Individual Defendants

41.     Defendant John M. Cook, II ("Cook"), a co-founder of Alfi, has been the Company's Chief Business Development Officer since October 2020, and previously served as Alfi's CFO from April 2018 until October 2020. In addition, Cook served as a director of the Company, resigning from the Board of Directors effective upon completion of the IPO. Cook signed or authorized the signing of the Company's Registration Statement filed with the SEC.

42.     Defendant Peter Bordes ("Bordes") has been a director of the Company at all relevant times, and has been Alfi's Interim CEO since October 22, 2021. Bordes is also the Executive Chairman and CEO of Trajectory Alpha Acquisition Corp., and was previously the CEO of Kubient, Inc., OneQube, Inc., MediaTrust, and MainBloq. Bordes signed or authorized the signing of the Company's Registration Statement filed with the SEC.

43.     Defendant Jim Lee ("Lee") has been a director of the Company at all relevant times, and has been Alfi's Chairman since October 22, 2021. Lee is the founder, President and CEO of Lee Aerospace, Inc. Lee signed or authorized the signing of the Company's Registration Statement filed with the SEC.

44.     Defendant Justin Elkouri ("Elkouri") served as a director of the Company,

resigning from the Board of Directors effective upon completion of the IPO. Elkouri signed or authorized the signing of the Company's Registration Statement filed with the SEC.

45.     Defendant Allison Ficken ("Ficken") has served as a director of the Company at all relevant times and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

46.     Defendant Frank Smith ("Smith") has served as a director of the Company at all relevant times and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

47.     Defendant Richard Mowser ("Mowser") served as a director of the Company and the Chair of the Audit Committee until his resignation on October 27, 2021. Mowser signed or authorized the signing of the Company's Registration Statement filed with the SEC. Mowser served as Alfi's Audit Committee expert, and has served as an auditor for several years.

48.     Defendants Pereira, McIntosh, Cook, Bordes, Lee, Elkouri, Ficken, Smith, and Mowser are collectively referred to hereinafter as the "Securities Act Individual Defendants."

**E.     Underwriter Defendants**

49.     Defendant Kingswood Capital Markets ("Kingswood") served as one of the underwriters for Alfi's IPO. In the IPO, Kingswood agreed to purchase 3,003,417 shares of the Company's common stock and warrants, exclusive of the over-allotment option. Also in connection with the IPO, the underwriters received an underwriting discount in the amount of $1.425 million.

50.     Defendant Revere Securities LLC ("Revere") served as an underwriter for Alfi's IPO. In the IPO, Revere agreed to purchase 481,927 shares of the Company's common stock and warrants, exclusive of the over-allotment option. Also in connection with the IPO, the underwriters received an underwriting discount in the amount of $1.425 million.

14

51.     Defendant Westpark Capital, Inc. ("Westpark") served as an underwriter for Alfi's IPO. In the IPO, Westpark agreed to purchase 246,000 shares of the Company's common stock and warrants, exclusive of the over-allotment option. Also in connection with the IPO, the underwriters received an underwriting discount in the amount of $1.425 million.

52.     Defendants Kingswood, Revere, and Westpark are collectively referred to hereinafter as the "Underwriter Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background Of Alfi And Its Business

53.     Alfi is an advertising-analytics technology company founded in April 2018 by Defendant Paul Pereira, Alfi's then-CEO, Defendant Cook, Alfi's Chief Business Development Officer and former CFO, and Defendant Pereira's son, Charles Pereira, Alfi's then-Chief Technology Officer.[1] Alfi's Digital Out-of-Home ("DOOH") advertising platform uses artificial intelligence, machine learning, and proprietary computer vision to deliver targeted advertising in a purported ethical and privacy-conscious manner.

54.     Through a process called facial fingerprinting, Alfi's platform is purportedly able to determine a particular viewer's demographics, geolocation, and emotion of someone in front of an Alfi-enabled device, such as a tablet or large kiosk screen. Alfi is then able to deliver content to that particular viewer based on their demographic and psychographic profile without using a tracking cookie. At the same time, the platform's artificial intelligence and machine learning components "also gather retina tracking data, keyword recognition and voice intonation

---

[1] Alfi is a very small company. At the time of the IPO, Alfi had "approximately 21 employees, 14 of whom are technical developers of Alfi and four are sales and marketing focused." As of May 2022, Alfi had "approximately 40 employees, including 33 full time employees," thirteen of which are technical developers and ten of which are sales and marketing focused.

15

without compromising the privacy of the end-user"—thus delivering "the right content, to the right person at the right time in a responsible and ethical manner."

55.     Alfi claims that its platform also addresses the supposed analytical "black hole" of current DOOH advertising, which suffers from lack of personalization and the capability to measure metrics important to advertisers, such as customer behavior and conversion. Alfi states that it provides advertisers with "real time, accurate and rich reporting on customer demographics, usage, interactivity and engagement while never storing any personal identifiable information." In Alfi's Registration Statement, the Company stated that based on its testing, Alfi has been able to achieve click through rates of between 6% and 9%, compared to an average click through rate of less than 1% for a display banner ad.

56.     In Alfi's Registration Statement, the Company explained that its initial focus is to place its Alfi-enabled devices in rideshares and airports, and that the Company currently had approximately 9,600 tablets, with approximately 8,600 tablets on-hand and appoximately1,000 tablets in service with rideshares or other businesses. Alfi also stated in its Registration Statement that it anticipated generating revenue from the Alfi-enabled devices not later than the second quarter of 2021 by charging customers based on an ads delivered model.

**B.     Alfi's IPO**

57.     On or about January 8, 2021, Alfi filed with the SEC its registration statement on Form S-1, which would later be utilized in the IPO following multiple amendments on Form S-1/A, the last of which was filed on April 26, 2021 and declared effective by the SEC on May 3, 2021.

58.     On May 3, 2021, Defendants priced the IPO at $4.15 per share of common stock and per warrant. The warrants sold in Alfi's IPO were each exercisable for one share of common stock at an exercise price of $4.57 per share, expiring five years from the date of issuance. Then,

on or about May 5, 2021, Alfi filed the final prospectus for the IPO with the SEC ("Prospectus"), which forms part of the registration statement (the Prospectus and the Form S-1 together with all amendments thereto, are collectively referred to as the "Registration Statement"). On May 4, 2021, Alfi securities began trading on the NASDAQ, with its common stock trading under the ticker symbol "ALF" and the warrants trading under the ticker symbol "ALFIW."

59.     On May 6, 2021, the Company completed the IPO, in which 3,731,344 shares of common stock and 3,731,344 warrants to purchase one share of common stock were sold at a public offering price of $4.15 per share and warrant. On May 10, 2021, Alfi announced that the underwriters had exercised their over-allotment option to purchase an additional 559,701 shares and 559,701 warrants granted to the underwriters in connection with the IPO.[2]

60.     In total, Alfi sold 4,291,045 shares of common stock and 4,291,045 warrants in the IPO, for aggregate proceeds of $17.8 million, and net proceeds of $15.7 million after deducting underwriting discounts and commissions and other offering expenses. In addition, as of August 13, 2021, 3,507,237 of the warrants sold in the IPO were exercised, providing Alfi with $16,028,073 in additional funding.

61.     Alfi stated in its Prospectus that it intended to use the net proceeds from the IPO to repay multiple outstanding loans from certain of the Individual Defendants and other related parties. At the time of the IPO, Alfi owed over $5.3 million from outstanding loans in addition to accrued and unpaid interest. Alfi stated that it also intended to use up to $950,000 to acquire the balance of any remaining Alfi-enabled tablet acquired by Lee Aerospace on Alfi's behalf that had not yet been acquired by the Company, and that any remaining amounts would be used for

---

[2] At the time of the IPO, Alfi's previously issued shares were subject to lockup agreements and thus were not freely tradeable on the open market.

"product launch, general corporate purposes, including working capital, business development, sales and marketing activities and capital expenditures."

     **C.**     **Shortly After The IPO, Alfi Hypes Its Technology Rollout And Announces A $2 Million Share Repurchase Program, Sending Alfi's Stock To Its All-Time High**

62.     On May 17, 2021, Alfi announced that it was resuming the rollout of its tablets in rideshares in Miami and ten other major U.S. cities after a delay due to the COVID-19 pandemic. The announcement further explained that Alfi was currently installed in "several hundred screens" in rideshares serving Miami, the United Kingdom, and Northern Ireland, and that the Company currently expected this next phase of the rollout to expand to approximately 10,000 tablets.

63.     Over the next few weeks, Alfi made a series of announcements, including that it had been selected to install its platform in kiosks at two different international airports, and that it was installing its tablets in almost 800 cabs in Belfast.

64.     On June 15, 2021 Alfi announced that it had entered into an agreement with All-Niter, a full service 3D printing and laser cutting business, "for the fulfillment, staging and shipment of the first 10,000 digital tablets to Uber and Lyft drivers nationwide." Alfi further announced "a massive operation unfolding in Miami today with hundreds of Ubers and Lyfts installing Alfi tablets. It's an epic event and marks the start of our nationwide rollout."

65.     The following day, on June 16, 2021, Defendant Pereira appeared on Benzinga, an online platform providing "real-time news with actionable trading ideas," during Benzinga's "ZingerNation Power Hour" livestream show to discuss Alfi's rollout and the stock market's positive response thereto.[3] During the show, Defendant Pereira was asked to give more

---

[3] This show is available at https://www.youtube.com/watch?v=OOoXywi5AWo (last accessed

background on the All-Niter deal and Alfi's pipeline. In response, Defendant Pereira stated that "as I speak today we have over 22,000 Uber Lyft drivers signed up waiting for deployment of Alfi tablets. In major cities right across the U.S." A little later on the show Defendant Pereira also stated that demand for the tablets and from brands was growing, and hence, Alfi "basically committed to 50,000 tablets with Lenovo for delivery."

66.     Alfi confirmed Defendant Pereira's statements made during the Benzinga show in a press release and highlighted that "Excess of 20,000 Uber and Lyft drivers waiting for installation of Alfi screens" the next day, June 17, 2021.

67.     Alfi continued to announce its efforts in rolling out its product throughout the summer of 2021, announcing: the commencement of rideshare tablet installation in Orlando and Tampa on July 7, 2021; the "national rollout of intelligent tablets directly to drivers who opted into the rideshare program in 13 additional major markets" and that "[o]ver 30,000 rideshare drivers nationwide have subscribed for tablet installation" on August 17, 2021; and that All-Niter had to "increase its capabilities to match the new Alfi demands" from the Company's ramped up tablet deployment strategy on August 25, 2021.

68.     Separately, on June 22, 2021, Defendant Pereira provided encouraging commentary exclusively to Benzinga, stating that Alfi was announcing a $2 million stock buyback. Benzinga quoted Defendant Pereira as saying "We will continue to buy back our stock as [a] firm commitment to our company valuation…. Our commitment to a tight float and our retail base is unwavering." This news skyrocketed Alfi's shares, rising $8.49 per share on June 22, 2021, or 108.85%, from a closing price of $7.80 per share on June 21, 2021, to a closing price of $16.29 per share on June 22, 2021, on extraordinarily high volume.

_____

June 10, 2022). Defendant Pereira appears on the show at approximately 5:01 through 21:50.

69.     After the close of market on June 22, 2021, the SEC accepted a Form 8-K filed by Alfi that was deemed filed on June 23, 2022. The 8-K stated that: "On June 22, 2021, a Benzinga news article was published based in part on an interview given by Paul Pereira, the Chief Executive Officer of Alfi, Inc. (the "Company"). This Form 8-K is being furnished to provide certain information to investors that was stated in the article[]" pursuant to Item 7.01 of Form 8-K.[4] The 8-K reported certain portions of the Benzinga article: "The article stated that 'Alfi announced a new $2 million buyback plan' and Mr. Pereira is quoted stating '[w]e will continue to buy back our stock as [a] firm commitment to our company valuation.' In addition, Mr. Pereira is quoted stating that Company's stock is 'undervalued based on pipeline projections and identified opportunity.'"

70.     Also on June 23, 2021, Alfi filed a second Form 8-K with the SEC attaching a press release. The Form 8-K and press release announced that on June 23, 2021, the Alfi Board of Directors "authorized and approved" a share repurchase program for up to $2 million of its outstanding common stock. The announcement included a quote for Defendant Pereira, who stated:

> We are committed to enhancing stockholder value and approach this objective with a firm belief and respect for our shareholder base[.] …In keeping with this objective, today we are announcing a stock repurchase program of up to $2 million. We are a young company with a big opportunity to grow and increase our valuation. Our balance sheet has benefited from the exercise of some of the warrants associated with our IPO, and our conviction in our future prospects makes this an appropriate time to repurchase stock and return capital to stockholders.

The share repurchase program was completed on July 9, 2021, with Alfi acquiring 137,650 shares

---

[4] Item 7.01 is a Regulation FD Disclosure which prohibits a public company from selectively disclosing material nonpublic information about itself or its securities to certain persons outside the company, such as analysts and shareholders, unless it also discloses the information to the public. If such a disclosure does occur, Regulation FD requires that such information also be furnished to the public either simultaneously or as soon as practicable, but no later than 24 hours.

at an average price of $14.5296 per share.

71.     In response to Alfi's announcements hyping the rollout of its technology and the Company's share repurchase program, Alfi's share price reached an all-time high on June 28, 2021, reaching a peak price of $22.50 per share during the day, to close at $18.59 per share, the Class Period, and all-time, high. In addition, warrant holders had exercised warrants to purchase 3,385,746 shares of common stock as of June 30, 2021, providing Alfi with just under $15.5 million in additional working capital.

**D.     The True State Of Alfi Emerges Over Several Announcements**

**1.     Defendant Pereira, Defendant McIntosh, And Charles Pereira Are Placed On Paid Administrative Leave And Alfi Commences An Internal Investigation**

72.     On October 28, 2021 after the market closed, Alfi announced on Form 8-K with the SEC that on October 22, 2021, the Company's Board "placed each of Paul Pereira, the Company's President and Chief Executive Officer, Dennis McIntosh, the Company's Chief Financial Officer and Treasurer, and Charles Pereira, the Company's Chief Technology Officer, on paid administrative leave and authorized an independent internal investigation regarding certain corporate transactions and other matters" (the "Investigation").

73.     Alfi further announced that the Board had also elected Defendant Bordes to serve as Interim CEO and Defendant Lee to serve as Chairman of the Board, replacing Defendant Pereira in both these roles, on October 22, 2021.

74.     In this same announcement, Alfi further disclosed that on October 28, 2021, Charles Pereira's employment with the Company was terminated.

75.     On this news, the Company's shares fell $1.24, or approximately 21.91%, to close at $4.42 on October 29, 2021, damaging investors.

21

**2.     Alfi Announces The Resignations Of Its Prior Auditors, The Resignation Of Its Audit Committee Chair, And Discloses Further Information Behind Its Decision To Place Its Executives On Leave And To Authorize The Investigation**

76.     On November 1, 2021, Alfi made several announcements within a Form 8-K filed with the SEC.

77.     First, Alfi announced that the auditing firm it had just hired on October 18, 2021, Friedman LLP, had resigned on October 29, 2021, but did not provide any further disclosures in connection with Friedman's resignation. In addition, Alfi disclosed that its prior auditor, Slack & Company CPAs, LLC, which had audited Alfi's financials for the years ending December 31, 2020 and 2019, *i.e.*, the financial periods reported in Alfi's Registration Statement, had notified Alfi in August that it was resigning after Slack completed its work on Alfi's Form 10-Q for 2Q 2021, because Slack was closing its business.

78.     Second, Alfi announced that the Board had received a letter via email from Richard Mowser, a director of the Company and its Audit Committee chair, resigning from the Board effective immediately. In his letter, Mowser stated that he decided to resign based on the actions taken by the Board at its October 22, 2021 meeting and that the "decision to replace the CEO/Founder, the CFO and the CTO in my opinion was personal and calculated and driven by certain directors/shareholders to take control of the company without any regard for due process." Mowser further stated in his letter that the replacement decisions was "made through clandestine meeting by said Board members prior to the 22 Oct BOD Meeting where by resolutions were put forward without prior consultation with other board members, notably myself[.]"

79.     Mowser stated in his letter that he believed the Board "acted precipitously in absence of any written policies nor governance committee in operation and no written warning or

communication to any of these chiefs regarding any action/actions that may have concerned any Board member at any point in time[.]" Mowser did acknowledge that "there may be concerns as to the actions of the CEO in the allegations raised," but called the replacement of the executives a "fait a compli" due to the lack of attempt to allow Defendant Pereira, Defendant McIntosh, and Charles Pereira to "defend their position" or to discuss alternative options with the Board.

80.     Third, Alfi's 8-K explained that two separate corporate transactions precipitated the Board's decision to place the executives on leave and to authorize the Investigation. The first transaction was the Company's purchase of a condominium for $1.1 million in Miami Beach, Florida and the "related erroneously certified corporate resolution regarding the unanimous approval by the Board and the Company's stockholders of such purchase."

81.     The second transaction was Alfi's commitment to sponsor a sports tournament for $640,000, a portion of which was payable through issuance of unregistered shares of Alfi's common stock. A November 2, 2021 Miami Herald article[5] points out that although Alfi did not name the sports tournament in its 8-K, Defendant Pereira had said during a previous interview with the Miami Herald that Alfi planned to sponsor the Necker Cup, a tennis tournament hosted by Richard Branson in the British Virgin Islands. The Miami Herald further noted that a Google search revealed references to the "Alfi Necker Cup," but that Alfi's name had been stripped when visiting the tournament's website and social media.

82.     Alfi explained in the November 1, 2021 8-K that these transactions were undertaken by Alfi's management "without sufficient and appropriate consultation with or approval by the Board." Alfi further explained that the Investigation will investigate the details

---

[5] Rob Wile, *Mystery $1M condo purchase sparked suspensions, firing at Miami Beach tech firm*, THE MIAMI HERALD, Nov. 2, 2021.

of these two transactions, and any other matters that come to the Board's attention regarding actions taken by the executives during their management of Alfi. The 8-K also stated that one of the goals of the investigation is to help Alfi develop "improved corporate governance policies and procedures to ensure that the Board is provided the opportunity to consider and provide appropriate input to the Company's management on significant corporate transactions."

### 3.   Shortly Thereafter, Alfi Announces It Is Being Investigated By The SEC And That It Would Be Unable To Timely File Its Quarterly Financial Results

83.   On November 15, 2021, after the market closed, Alfi filed a Form 8-K with the SEC announcing that on November 9, 2021, the Company received a letter from the SEC notifying Alfi that all documents and data should be "reasonably preserved until further notice" because "the Company, its affiliates and agents may possess documents and data relevant to an ongoing investigation being conducted by the staff of the SEC." More specifically, the SEC notified Alfi to preserve and retain all documents and data created on or after April 1, 2018 that: "(i) were created, modified or accessed by certain named former and current officers and directors of the Company or any other officer or director of the Company; or (ii) relate or refer to the condominium or the sports tournament sponsorship…, or financial reporting and disclosure controls, policies or procedures."

84.   In a separate filing with the SEC accepted after the close of market on November 15, 2021 and filed on November 16, 2021, Alfi stated that it was unable to timely file its quarterly report on Form 10-Q for the period ended September 30, 2021 due to the recent changes in its executive management and its Board and due to Alfi not yet engaging a new independent public accounting firm to review the Q3 2021 financials.

85.   On all this news, Alfi's stock price fell $0.24, or 5.21%, to close at $4.37 per share on November 16, 2021, damaging investors.

### 4.      Defendants Pereira And McIntosh Resign From Alfi

86.      On February 3, 2022, Alfi filed a Form 8-K with the SEC announcing that on February 2, 2022, Defendant Pereira resigned from his position as a director of Alfi as well as all other positions he held with the Company effective that day. Similarly, Defendant McIntosh also resigned from all positions he held with the Company on February 2, 2022, effective that day.

### 5.      Alfi Announces The Conclusion And Findings Of Its Independent Investigation

87.      On February 23, 2022, Alfi filed a Form 8-K with the SEC to report on the results of its independent investigation conducted by a special committee of the Board, outside legal counsel, and certain additional advisors to provide certain accounting and computer forensics and other services (the "Investigation"). The Investigation included several findings, detailed in the subsections below, including that: (a) the former executives caused Alfi to enter into certain transactions and agreements that were not approved by the Board; (b) the former executives engaged in certain other conduct; and (c) Alfi's internal control over financial reporting was deficient in several aspects. The Investigation also provided numerous recommendations to enhance Alfi's internal controls.

88.      However, the conclusion of the investigatory phase of the Investigation did not coincide with the filing of Alfi's 3Q 2021 10-Q. Rather, the February 23, 2022 8-K stated that Alfi's management was "still in the process of evaluating the issues and findings identified in the Investigation and assessing the Company's internal control over financial reporting, including whether any identified deficiencies constitute material weaknesses in internal controls" and whether any restatement or adjustment to Alfi's financial statements will be necessary.

25

a)    **The Former Executives Caused Alfi To Enter Five Different Corporate Transactions Without The Board's Knowledge Or Approval, And In Multiple Instances, Included The Unauthorized Issuance Of Alfi Common Stock As Part Of The Transaction**

89.    The Investigation confirmed that the "Company's former senior management" caused Alfi to purchase a condominium in Miami Beach, Florida for approximately $1.1 million without the Board's knowledge or approval. Specifically, Defendant Pereira "signed a certification filed with Miami-Dade County which incorrectly stated that the Board and the Company's stockholders approved the purchase." Moreover, the Investigation found that that the condominium was transferred to a newly formed limited liability company controlled by Defendants Pereira and McIntosh, without the Board's knowledge or approval. During the Investigation, Defendants Pereira and McIntosh stated that the limited liability company was owned by Alfi and "was formed to serve as a special purpose entity in order to facilitate a loan for which the Condominium would serve as security; however, the Investigation found no documentary evidence with respect to the ownership of the LLC."

90.    Alfi further stated that the Miami Beach condominium had been transferred back to the Company, and that Alfi has commenced the process of selling the condominium. Alfi later disclosed in its Restatement that net proceeds from the sale of the condominium, after commissions and other expenses, were approximately $990,000.

91.    The Investigation also confirmed that Alfi's "former senior management caused" Alfi to enter into an agreement to sponsor a sports tournament for two years for a $640,000 sponsorship fee, half of which was paid in cash, and the other half of which was paid through the issuance of 31,638 shares of Alfi common stock. As with the condominium purchase, this sponsorship agreement was executed, and the fee paid, without the Board's knowledge or approval. The Investigation found that Defendant McIntosh signed a certification to Alfi's

26

transfer agent which stated (incorrectly) that the issuance of this common stock was authorized by the Board.

92.     Alfi had since terminated the sponsorship agreement and obtained the return of the 31,638 shares of common stock. Of the $320,000 sponsorship fee paid in cash, $295,000 was converted to a charitable contribution, and the remaining $25,000 was retained by the sports tournament organizer.

93.     Alfi's Investigation also determined that "former senior management" caused Alfi to enter into agreements with three vendors. The first agreement was with an investor relations firm to provide investor relations and strategic consulting services and capital introductions. Alfi paid this investor relations firm $808,000, approximately $700,000 of which was in addition to amounts required under the agreement and issued 150,000 shares of common stock to the investor relations firm.

94.     The second agreement was with a consultant to provide financial and business advice. Under this agreement, Alfi issued the consultant 150,000 shares of common stock, even though the Investigation could not determine what, if any, services were provided to Alfi.

95.     The issuance of common stock to both the investor relations firm and the consultant were issued without the Board's knowledge or approval. Again, Defendant McIntosh "signed certifications to the Company's transfer agent which incorrectly stated that such issuances were authorized by the Board."

96.     The third agreement was with a start-up call center to provide customer service, sales, and onboarding services. Under this agreement, Alfi was to pay for commission-based compensation and to reimburse pre-approved costs or expenses. Alfi noted that minimal commissions were earned or paid due to minimal sales, but that $343,642 was paid to this vendor

despite the lack of evidence found in the Investigation that expenses were pre-approved by Alfi.

> **b)** **The Investigation Determined That Defendant Pereira Made False Representations To The Market And That The Former Executives Accessed And Attempted To Seize Alfi's Computer Systems After Being Placed On Administrative Leave**

97.    The Investigation also found certain other conduct involving Defendant Pereira, Defendant McIntosh, and Charles Pereira.

98.    Much of this other conduct involves Defendant Pereira making multiple inaccurate, misleading, and unapproved statements to the market. First, during Defendant Pereira's online interview with Benzinga on June 16, 2021,[6] Defendant Pereira stated that Alfi had over 22,000 rideshare drivers "signed up." "[H]owever, the Investigation found that, at such time, such number of drivers had expressed interest in applying to secure contracts with the Company and, in June 2021, 1,253 drivers had contracts with the Company. Such statement was made without the Board's knowledge or approval."

99.    Defendant Pereira again made inaccurate and unapproved statements to Benzinga just one week later, when Benzinga published an article on June 22, 2021 based in part on an interview given by Defendant Pereira. This June 22, 2021 Benzinga article stated that Alfi announced a $2 million share repurchase plan. However, the disclosure to Benzinga of a share repurchase program by Alfi was "made without the Board's knowledge or approval," and the Board *subsequently* approved such a share repurchase program of up to $2 million in shares of Alfi common stock on June 23, 2021, as was announced in a Form 8-K filed with the SEC that same day.

100.    In addition, the Investigation found that "[c]ertain social media posts (since

---

[6] Alfi's February 23, 2022 8-K mistakenly states that the interview with Benzinga was on June 15, 2021, but the YouTube link in n.3 states that the show was "[s]treamed live on Jun 16, 2021[.]"

removed from the platform) were made from an account created on [Defendant] Pereira's computer, using a name that did not identify him or the Company and did not purport to be made by or on behalf of him or the Company." These posts tended to tout Alfi and its prospects, and "some of which" the Investigation found "included inaccurate statements about the Company." "The social media posts were made from this account without the Board's knowledge or approval[,]" and Defendant Pereira has denied making the social media posts.

101.    Separately, after Defendant Pereira, Defendant McIntosh, and Charles Pereira were placed on leave and were instructed to not access Alfi's computer systems or platforms: (i) Charles Pereira (a) took control of, and prevented Alfi from administering, its Google Workspace (including the Company's email accounts, calendars, contacts, chats and saved files) and its Amazon Web Services (which hosts tablet data and provides a platform for Alfi's software development), and (b) obtained from Google downloadable access to all the data maintained in Alfi's Google Workspace; and (ii) Defendants Pereira and McIntosh accessed and downloaded files from Alfi's Google Drive.

102.    While Alfi was able to continue business during the time Charles Pereira took control of Alfi's Google Workspace and Amazon Web Services by implementing "workarounds" to these lockouts, Charles Pereira's interferences with the Google Workspace hindered, delayed, and increased the expense of the Investigation.

          **c)**      **The Investigation Found Alfi's Internal Control Over Financial Reporting To Be Deficient And Recommended Numerous Enhancements To Alfi's Internal Controls**

103.    The Investigation also found Alfi's internal control over financial reporting to be deficient with respect to: (1) the disbursement process for third-party vendors; (2) the review and approval process for significant vendor contracts; (3) the use of the Company credit card by executives; (4) the supervision and approval of travel and entertainment expenses incurred by

29

executives; (5) segregation of duties for the payment and recording of invoices and related bank reconciliations; (6) the lack of a sufficient accounting manual; and (7) guidelines for the capitalization of fixed assets.

104.   The Investigation's findings also included ten recommendations to enhance Alfi's internal controls over financial reporting:

a.   Continuing to maintain the proper "tone at the top" established by Alfi's new management that replaced Defendants Pereira, McIntosh, and Charles Pereira.

b.   Continuing to enhance controls for disbursements of funds for vendor invoices. Such enhancements include developing traches of spending limits based on the level of employee authorizing the expenditure, and developing a process to maintain adequate vendor files to document payments.

c.   Establishing segregation of duties across all aspects of the financial operations, including that the persons authorizing disbursements and recording them are not also preparing the bank reconciliations.

d.   Establishing a lockbox for customers to remit payments to Alfi.

e.   Developing a comprehensive accounting manual that addresses all aspects of the accounting function, and the closing of the books in preparation of financial statements.

f.   Continuing to limit the use of Alfi's corporate credit cards to a specific number of users and prohibiting Alfi's direct payment of credit card invoices.

g.   Maintaining the newly established travel and entertainment policy that requires submission of appropriate expense reports with supporting documentation and supervisory approval.

h.   Performing a fixed asset audit and establishing guidelines with respect to

the capitalization, maintenance, and repair of fixed assets.

      i.    Establishing a review and approval process for entering into significant vendor contracts, including those contracts that require the issuance of Alfi's common stock.

      j.    Retaining a consulting firm that specializes in internal control implementation and design to assist Alfi in enhancing its internal control over financial reporting.

105.    The February 23, 2022 8-K also listed the steps Alfi had already taken to address concerns regarding its former management and which address certain of the Investigation's internal control recommendations. These steps included the Board appointing a new Chairman, new management, and two new directors for the Board and the removal of Defendant Pereira, Defendant McIntosh, and Charles Pereira from all positions with the Company. In addition, Alfi engaged a new public accounting firm that has commenced audit work and implemented certain of the internal control enhancements recommended as part of the Investigation.

      **6.**    **Alfi Announces That Its Previously Issued Financial Reports Should No Longer Be Relied Upon**

106.    On March 11, 2022, after the close of market, Alfi announced that the Company's previously issued audited results for the years ended December 31, 2019 and 2020 (respectively, "FY 2019" and "FY 2020"), included in Alfi's Registration Statement, and the Company's previously issued quarterly financial statements on Form 10-Q for the quarterly periods ended March 31, 2021 ("1Q 2021") and June 30, 2021 ("2Q 2021") should no longer be relied upon and should be restated as a result of the following identified accounting errors:

      a.    Alfi incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of December 31, 2019 and 2020, March

31

31, 2021, and June 30, 2021. As Alfi explained in its Registration Statement, its intangible assets balance is comprised of the capitalized costs associated with the creation of its technology.

      b.    Alfi overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

      c.    Alfi overstated total assets and total liabilities as of December 31, 2020, by incorrectly recording a note receivable from related parties that was executed in December 2020, but not fully funded until April 2021.

      d.    Alfi did not recognize and report on its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021, an office lease in accordance with Financial Accounting Standards Board Accounting Standards Update No. 2018-11, Leases (Topic 842).

107.    Alfi explained that although the effects of these errors on net income and total stockholders' equity (the Company's net worth or book value) was still being determined, it preliminarily expected that Alfi's total stockholders' equity balances would decrease by $1.5 million as of December 31, 2019, by $2.9 million as of December 31, 2020, and by approximately $3.0 million as of June 30, 2021.

108.    Alfi also stated that it expected to conclude that material weaknesses in its internal controls over financial reporting for the periods covered by these accounting errors and that Alfi's disclosure controls and procedures for such periods were not effective.

109.    On all this news, Alfi's stock price fell $0.13, or 8.075%, to close at $1.48 per share on March 14, 2022, the first trading day after this news was released, damaging investors.

**7.    Post-Class Period, Alfi Issues Its Restated Financial Results**

110.    On May 16, 2022, after the end of the Class Period, Alfi issued two Form 10-

Q/As for 1Q 2021 and 2Q 2021 (the "1Q 2021 10-Q/A" and the "2Q 2021 10-Q/A", respectively). Also on this day, Alfi issued its belated Form 10-K for the 2021 fiscal year (the "2021 10-K"), which included accompanying restated financial statements for the 2019 and 2020 fiscal years (the 2019 and 2020 fiscal year restatement in the 2021 10-K, together with the 1Q 2021 10-Q/A and 2Q 2021 10-Q/A are referred to as the "Restatement").

111.    In the Restatement, Alfi's financial statements for the years ended December 31, 2019 and 2020 and the quarters ended March 31, 2021 and June 30, 2021 were restated to correct the four accounting errors announced on March 11, 2022 (*see* ¶106, *supra*), and also included a number of additional unexplained accounting adjustments. As a result, the stockholders' equity in the Company, *i.e.*, Alfi's net worth or book value, greatly decreased, as did Alfi's reported net income for FY 2019 and FY 2020:

| Financial Period End | Stockholders' Equity (Deficit) As Reported | Stockholders' Equity (Deficit) As Restated | Difference |
|---|---|---|---|
| FY 2019 | $2,564,864 | $32,731 | ($2,532,133) |
| FY 2020 | $1,030,905 | ($3,438,265) | ($4,469,170) |
| 1Q 2021 | ($1,895,970) | ($5,850,411) | ($3,954,441) |
| 2Q 2021 | $26,317,348 | $22,129,899 | ($4,187,449) |

| Financial Period | Net Income (Loss) As Reported | Net Income (Loss) As Restated | Difference |
|---|---|---|---|
| FY 2019 | $66,735 | ($1,599,132) | ($1,665,867) |
| FY 2020 | ($3,558,959) | ($5,547,275) | ($1,988,316) |
| 1Q 2021 | ($3,176,875) | ($2,708,831) | $468,004 |
| 2Q 2021 | ($4,692,471) | ($4,301,722) | $390,749 |

112.    As a result of the Restatement, the balances of Alfi's two most important (and potential revenue producing) assets—its technology (*i.e.*, intangible assets) and its tablets, tremendously decreased:

| Financial Period End | Intangible Asset Balance As Reported | Intangible Asset Balance As Restated | Difference |
|---|---|---|---|
| FY 2019 | $3,198,051 | $668,556 | ($2,529,495) |
| FY 2020 | $4,384,188 | $888,271 | ($3,495,917) |
| 1Q 2021 | $4,164,630 | $844,264 | ($3,320,366) |
| 2Q 2021 | $3,945,070 | $800,259 | ($3,144,811) |

| Financial Period End | Tablet Balance As Reported[7] | Tablet Balance As Restated[8] | Difference |
|---|---|---|---|
| FY 2019 | Alfi first purchased tablets in 2020, thus there is no balance for FY 2019. | | |
| FY 2020 | $1,104,000 | $388,820 | ($715,180) |
| 1Q 2021 | $1,104,000 | $194,410 | ($909,590) |
| 2Q 2021 | $1,039,625 | -$0- | ($1,039,625) |

a)  **As Part Of The Restatement, Alfi's Current Management Concluded That A Material Weakness Existed In Alfi's Internal Controls Over Financial Reporting**

113.    In connection with the Restatement, Alfi's current management also evaluated the

---

[7] Prior to the Restatement, Alfi reported its tablet balance as the "Other assets (complimentary devices), net" line item on the balance sheet.

[8] In connection with the Restatement, Alfi reported its tablet balance as part of the "Property and equipment, net" line item on the balance sheet. Note 10 to the 2021 10-K, and Note 9 to the 1Q 2021 and 2Q 2021 10-Q/As discuss property and equipment, explaining that this line item consists of the tablets plus office furniture and fixtures. Prior to the Restatement, "Property and equipment, net" line item consisted of just "office equipment." Thus, a simple net tablet balance can be determined by subtracting the previously reported "Property and equipment, net" from the restated "Property and equipment, net," and such a simple calculation was used in the figures in this table.

However, this simple tablet balance does not include unexplained adjustments in the Restatement to Alfi's balances for tablets and office furniture and fixtures prior to depreciation. Indeed, the balance of Alfi's tablets before depreciation (*i.e.*, the "as reported" balances) *decreased* from $1,104,000 to $972,050 as of both the end of FY 2020 and 1Q 2021, and the office furniture and fixtures balance before depreciation (*i.e.*, the "as reported" balances) increased from $117,474 to $191,261 as of the end of FY 2020 and from $116,368 to $199,052 as of March 31, 2021. Because the Restatement did not explain what portion of the depreciation expenses went to the tablets in either FY 2020 or 1Q 2021, there is no easy way to reconcile these unexplained changes in the tablet and office furniture starting balances to their net balances after deducting corresponding depreciation. However, because the pre-depreciation tablet balances *decreased* and the office furniture and fixtures balances *increased*, the true restated tablet balances as of the end of FY 2020 and 1Q 2021 would be lower than presented in this table.

34

effectiveness of Alfi's internal controls over financial reporting and disclosure controls and procedures, concluding that those controls were not effective and that a material weakness exists in Alfi's internal controls over financial reporting. A material weakness is a deficiency, or deficiencies, in a company's internal controls over financial reporting, and consequently there is a reasonable possibility that a material misstatement in the company's financial statements will not be detected and/or timely prevented.

114.    Management concluded that the Company "does not have a sufficient complement of personnel commensurate with the accounting and reporting requirements of a public company." As such, the identified material weaknesses relate to inadequate controls concerning the segregation of certain accounting duties and the reconciliation and analysis of key accounts. Moreover, management concluded that these material weaknesses arose because, "as a pre-revenue private company recently formed," Alfi did not have the "necessary personnel to design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company."

**b)**    **Alfi Discloses Receipt Of An SEC Subpoena Relating To The SEC's Ongoing Investigation**

115.    Also in connection with the Restatement, Alfi disclosed that on March 8, 2022, the Company received a subpoena from the SEC relating to the SEC's ongoing investigation.

**E.**    **Alfi's Registration Statement And Class Period Financial Results Were Not Presented In Accordance With GAAP**

116.    Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Defendants to comply with United States generally accepted accounting principles ("GAAP"), which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted

35

accounting practice at a particular time.

117.    SEC Regulation S-X requires that financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

118.    Furthermore, the fact that Alfi restated its financial statements and disclosed that its financial statements for FY 2019, FY 2020, 1Q 2021, and 2Q 2021 should not be relied upon is an admission that they were false and misleading when originally issued. (Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board Statement No. 154 at ¶ 25).

119.    Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants.

120.    Alfi admitted on March 11, 2022, when announcing that its previously issued financial results should not be relied upon, that it did not recognize an office lease in accordance with GAAP, specifically, Financial Accounting Standards Board Accounting Standards Update No. 2018-11, Leases (Topic 842). In addition, Alfi's financial results for FY 2019, FY 2020, 1Q 2021, and 2Q 2021 further violated GAAP, as explained below, and as a result, inflated Alfi's asset balances and deflated Alfi's expenses.

### a)    Applicable GAAP For Alfi's Intangible Assets

121.    ASC Topic 350-40, ("ASC 350-40") "provides guidance on accounting for the cost of computer software developed or obtained for internal use and for determining whether the software is for internal use. Certain costs incurred for computer software developed or obtained

for internal use should be capitalized depending on the nature of the costs and the project stage during which they were incurred." ASC 350-40-05-1.

122.     During the development stage of the software or application, ASC 350-40-25 states that internal and external costs incurred to develop internal-use computer software as well as "[c]osts to develop or obtain software that allows for access to or conversion of old data by new systems" shall be capitalized. However, training costs and data conversion costs shall be expensed as incurred, and shall not be capitalized. ASC 350-40-25-2–ASC 350-40-25-5.

123.     ASC 350-40-30 includes further guidance on the types of costs that should be capitalized for internal-use software. Specifically, only the following costs may be capitalized: (a) external direct costs of materials and services consumed in developing the software; (b) "[p]ayroll and payroll-related costs … for employees who are *directly associated* with and who devote time to the internal-use computer software project, *to the extent of the time spent directly on the project*;" and (c) interest costs incurred while developing the software. ASC 350-40-30-1 (emphasis added). ASC 350-40-30-3 specifically excludes general and administrative costs from being capitalized, stating: "General and administrative costs and overhead costs shall not be capitalized as costs of internal-use software."

124.     However, as Alfi admitted when announcing that its previously issued financial results should not be relied upon, "[t]he Company incorrectly capitalized certain general and administrative expenses incurred" during 2018-2020, and that those incorrectly capitalized costs were included in the intangible assets balance in Alfi's balance sheet for FY 2019, FY 2020, 1Q 2021, and 2Q 2021.

125.     Prior to Alfi's Registration Statement becoming effective, the Company engaged in a series of letter communications with the SEC beginning on December 23, 2020 concerning

37

the SEC's comments to the Registration Statement. Letters from the SEC on January 21, 2021 and February 25, 2021 instructed Alfi to clarify the costs that the Company capitalized and the costs that are expensed, and specifically alerted Defendants to the applicable GAAP, ASC-350-40.

### b)      Applicable GAAP For Alfi's Tablets

126.     Prior to Restatement, Alfi's financial statements for FY 2019, FY 2020, 1Q 2021, and 2Q 2021 reported its tablets on the balance sheet at the lower of cost or fair market value under the line item "Other assets (complimentary devices)" until the tablet was provided to a rideshare or another business. Once placed into service for consumer use, Alfi expensed the tablet as a cost of sales.

127.     This is similar to the accounting for inventory, an asset that is defined and characterized as a tangible item that is held for sale in the ordinary course of business, or is in the process of production, or being used in the production, for such sale. "The term inventory embraces goods awaiting sale …." ASC 330-10-20. Thus, the inventory balance on a company's balance sheet represents the "balance of costs applicable to goods on hand remaining after the matching of absorbed costs with concurrent revenues." ASC 330-05-03.

128.     Inventory can be distinguished from a company's other property and equipment—"inventory has financial significance because revenues may be obtained from its sale." ASC 330-05-02.

129.     Alfi, however, does not sell its tablets for revenue, as the SEC noted in its first letter to Alfi dated December 23, 2020. Specifically, the SEC stated: "We note you currently classify the tablet hardware devices that are placed into service with customers as inventory. Please consider renaming your line item as you do not sell these tablet devices for revenue. Refer to ASC 330-10-05-2."

38

130.     Later in the December 23, 2020 letter, the SEC again brought up Alfi's accounting for its tablets stating: "Your disclosure indicates that once you place a tablet device into service with a customer, you expense the inventory in full." The SEC requested that Alfi "provide us with your analysis and guidance considered to fully expense these tablets, rather than amortizing the tablets over their estimated useful lives."

131.     In the SEC's second letter on January 21, 2021, the SEC again noted that Alfi continued to classify the tablets as inventory and again encouraged Defendants to rename the line item as Alfi "do[es] not sell these tablet devices for revenue," citing ASC 330-10-05-02. The January 21, 2021 letter also again requested that Alfi provide its analysis and guidance as to why it expensed its tablets.

132.     Alfi responded unsatisfactorily, prompting the SEC to again comment in a March 16, 2021 letter:

> Please explain how you concluded to continue to classify these tablet devices as inventory and as a current asset on your balance sheet. In this regard, we note that you do not directly generate revenue from the sale of these tablet devices, but rather are provided as a complimentary product and expensed to cost of sales. Refer to ASC 330-10-05-2.

133.     Rather than reconsider the appropriate way to account for the tablets, in its response on March 17, 2021, Alfi decided to "relabel" the tablets as "Other assets (Complimentary Devices)" and reported its tablets at cost with no allowance for depreciation, and thus, also did not record any depreciation expense in its financial statements for FY 2019, FY 2020, 1Q 2021, and 2Q 2021.

134.     But, as Alfi admitted when announcing that its previously issued financial results should not be relied upon, the way Alfi accounted for its tablets was "incorrect" and, in the Restatement, Alfi accounted for its tablets as property and equipment, "recorded at cost, less accumulated depreciation … computed using the straight-line method over estimated useful lives

39

of three years."

135.    Although Alfi's Restatement explains that the Company determined to depreciate Alfi's tablets using a three year straight-line method, as the tablet table in ¶112 shows, Alfi's net tablet balance was $0 as of June 30, 2021—meaning that the actual estimated useful life of the tablets was, at most, just 1.5 years.

## V.    VIOLATIONS OF THE SECURITIES ACT

136.    Plaintiffs' claims under the Securities Act do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of his claims under the Securities Act. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

137.    As alleged below, Alfi and other Defendants made a series of materially untrue statements or omissions of material facts in the offering materials filed in connection with Alfi's IPO.

138.    Alfi's IPO was made pursuant to the Registration Statement, including the final Prospectus, filed with the SEC on May 5, 2021. The Registration Statement was signed by Defendants Pereira, McIntosh, Cook, Bordes, Lee, Elkouri, Ficken, Smith, and Mowser.

139.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading. The Registration Statement was not prepared in accordance with the rules and regulations governing their preparation.

140.    The Registration Statement included Alfi's financial statements for FY 2019 and FY 2020. In its Registration Statement, Alfi reported the following balances as of December 31, 2019: (1) $3,198,051 for the Company's intangible assets; and (2) $2,564,864 for the Company's total stockholders' equity. The Registration Statement also reported net income of $66,735 for FY 2019.

141.    The Registration Statement reported the following balances as of December 31, 2020: (1) $4,384,188 for the Company's intangible assets; (2) $1,104,000 for the Company's "other assets (complimentary devices), net," *i.e.*, Alfi's tablets; and (3) $1,030,905 for the Company's total stockholders' equity. The Registration Statement also reported a net loss of $3,558,959 for FY 2020.

142.    The Registration Statement stated, under Management's Discussion and Analysis of Financial Condition and Results of Operations: "Our management's discussion and analysis of our financial condition and results of operations are based on our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP."

143.    Note 2 accompanying the financial statements in the Registration Statement similarly stated: "the accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP")."

144.    The foregoing statements in ¶¶140-143 were materially untrue or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading because they failed to disclose the following adverse facts:

41

a.     That Alfi's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated.

b.     That the Company's financial statements for FY 2019 had materially overstated Alfi's balances for its intangible assets (*i.e.*, its technology) and stockholders' equity as well as Alfi's net income.

c.     That the Company's financial statements for FY 2020 had materially overstated Alfi's balances for its intangible assets (*i.e.*, its technology), other assets (*i.e.*, tablets), and stockholders' equity, and materially understated Alfi's net loss.

d.     That, as Alfi later admitted in connection with the Restatement, for FY 2019, the correction of the aforementioned errors and the additional unexplained accounting adjustments would decrease net income by $1,665,867, to a restated net *loss* of $1,599,132, and decreased Alfi's stockholders' equity balance by $2,532,133, to a restated stockholders' equity balance of $32,731.

e.     That, as Alfi later admitted in connection with the Restatement, for FY 2020, the correction of the aforementioned errors and the additional unexplained accounting adjustments would increase Alfi's net loss by $1,988,316, to a restated net loss of $5,547,275, and decreased Alfi's stockholders' equity balance by $4,469,170, to a restated stockholders' *deficit* balance of $3,438,265.

f.     That, as Alfi later admitted in connection with the Restatement, "[t]he Company incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of December 31, 2019 and 2020[.]" The correction of this error decreased Alfi's FY 2019 intangible asset balance by $2,529,495, to a restated balance

42

of $668,556 as of December 31, 2019, and decreased Alfi's FY 2020 intangible asset balance by $3,495,917, to a restated balance of $888,271 as of December 31, 2020.

g.       That, as Alfi later admitted in connection with the Restatement, "[t]he Company overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of December 31, 2019 and 2020[.] The correction of this error decreased Alfi's FY 2020 reported balance for its tablets by $715,180 to a restated balance of $388,820 as of December 31, 2020.

h.       That, as Alfi later admitted in connection with the Restatement, "[t]he Company overstated total assets and total liabilities as of December 31, 2020, by incorrectly recording a note receivable (related parties) and a liability included in current portion of long-term debt (related parties). This note receivable represents a bridge loan provided to the Company by certain related parties that was executed in December 2020 but not fully funded until April 2021."

i.       That, as Alfi later admitted in connection with the Restatement, "[t]he Company did not recognize and report on its balance sheets as of December 31, 2019 and 2020, … an office lease in accordance with" GAAP.

145.   The Registration Statement stated: "Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles."

146.   The Registration Statement further stated: "Our disclosure controls and procedures are designed to reasonably assure that information required to be disclosed by us in

reports we file or submit under the Exchange Act is accumulated and communicated to management, recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC."

147. The foregoing statements in ¶¶145-146 were materially untrue and/or misleading for the same reasons as stated above in ¶144. In addition, the statements made in ¶¶145-146 were materially untrue or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading because they failed to disclose the following adverse facts:

a. That, as Alfi later admitted in connection with its Restatement, Alfi's internal controls over financial reporting were not effective as of the time these statements were issued and material weaknesses existed in the Company's internal controls over financial reporting.

b. That, as Alfi later admitted in connection with its Restatement, the Company "does not have a sufficient complement of personnel commensurate with the accounting and reporting requirements of a public company."

c. That, as Alfi later admitted in connection with its Restatement, these material weaknesses relate to inadequate controls concerning the segregation of certain accounting duties and the reconciliation and analysis of key accounts, and arose because, "as a pre-revenue private company recently formed," Alfi did not have the "necessary personnel to design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company."

d. That, as Alfi later admitted in connection with the conclusion of its

44

Investigation, the former executives caused Alfi to enter into certain transactions and agreements, some of which included the issuance of Company stock, that were not approved by the Board; Defendant Pereira's made multiple inaccurate, misleading, and unapproved statements to the market during his tenure; and the former executives accessed and attempted to seize Alfi's computer systems after being placed on administrative leave.

      e.    That, as Alfi later admitted in connection with the conclusion of its Investigation, Alfi's internal control over financial reporting was also deficient in many respects as listed in ¶103, and that Alfi should work on enhancing its internal controls over financial reporting by following the recommendations listed in ¶104.

## VI.    VIOLATIONS OF THE EXCHANGE ACT

    148.    During the Class Period, Alfi and the Individual Defendants made materially false and/or misleading statements and omissions of material fact to investors in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

    149.    Each of the statements and omissions identified below (in this Section VI.A) as false and/or misleading was made with scienter because Alfi and the Individual Defendants knew and/or recklessly disregarded that their statements were false and/or misleading and/or omitted material information required to be stated therein to make their statements not misleading.

    **A.    Defendants' Materially False And Misleading Statements And Omissions In Violation Of The Exchange Act**

        **1.    False And Misleading Statements And Omissions in Alfi's Registration Statement**

    150.    The Class Period begins on May 4, 2021, when Alfi's common stock and warrants began publicly trading pursuant to the Registration Statement. The statements made within the Registration Statement as detailed in ¶¶140-143, 145-146 were also materially false and misleading in violation of the Exchange Act for the same reasons as detailed in ¶¶144, 147.

**2.      False And Misleading Statements And Omissions in Alfi's 1Q 2021
Financial Results**

151.     On June 10, 2021, Alfi filed its Form 10-Q for the quarter ended March 31, 2021

(the "1Q 2021 10-Q"), which was signed by Defendants Pereira and McIntosh on behalf of the

Company. Therein, Alfi reported a balance of: (1) $4,164,630 for the Company's intangible

assets; (2) $1,104,000 for the Company's "other assets (complimentary devices), net," *i.e.*, Alfi's

tablets; and (3) $1,895,970 for the Company's total stockholders' deficit (*i.e.*, a negative

stockholders' equity balance). The 1Q 2021 10-Q also reported a net loss of $3,176,875.

152.     Note 1 accompanying the financial statements in the 1Q 2021 10-Q stated: "the

accompanying consolidated financial statements have been prepared in conformity with

accounting principles generally accepted in the United States of America ('U.S. GAAP')."

153.     Item 2, Management's Discussion and Analysis of Financial Condition and

Results of Operations, in the 1Q 2021 10-Q similarly stated: "Our management's discussion and

analysis of our financial condition and results of operations are based on our financial

statements, which have been prepared in accordance with accounting principles generally

accepted in the United States, or GAAP."

154.     The foregoing statements made in ¶¶151-153 were materially false and/or

misleading when made and/or omitted to state material facts necessary to make the statements

not misleading, because they failed to disclose the following adverse facts:

        a.      That Alfi's financial results and financial statements were not presented in

accordance with GAAP and that those financial statements/results were materially misstated.

        b.      That the Company's financial statements for the 1Q 2021 had materially

overstated Alfi's balances for its intangible assets (*i.e.*, its technology), other assets (*i.e.*, tablets),

and stockholders' equity and materially misstated Alfi's net loss.

c.      That, as Alfi later admitted in connection with the Restatement, the correction of the aforementioned errors and the additional unexplained accounting adjustments would result in a decrease of net loss by $468,004, to a restated net loss of $2,708,831, and further decreased Alfi's stockholders' deficit balance by $3,954,441, to a restated stockholders' deficit balance of $5,850,411.

d.      That, as Alfi later admitted in connection with the Restatement, "[t]he Company incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of … March 31, 2021[.]" The correction of this error decreased Alfi's intangible asset balance by $3,320,366, to a restated balance of $844,264.

e.      That, as Alfi later admitted in connection with the Restatement, "[t]he Company overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of … March 31, 2021[.] The correction of this error decreased Alfi's reported balance for its tablets by $909,590 to a restated balance of $194,410.

f.      That, as Alfi later admitted in connection with the Restatement, "[t]he Company did not recognize and report on its balance sheets as of … March 31, 2021, … an office lease in accordance with" GAAP.

155.    The 1Q 2021 10-Q also stated under Item 4. Controls and Procedures:

Our Chief Executive Officer and Chief Financial Officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2021 (the "Evaluation Date"). Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that, as of the Evaluation Date, our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) are recorded, processed, summarized and reported, within the time periods specified in

the SEC's rules and forms and (ii) are accumulated and communicated to management, specifically our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control Over Financial Reporting*

There was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) or 15d-15(f) under the Exchange Act) identified in connection with the evaluation required by Rules 13a-15(d) or 15d-15(d) that occurred during the fiscal quarter ended March 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

156.    Attached as Exhibits 31.1 and 31. 2 to Alfi's 1Q 2021 10-Q were certifications

pursuant to Section 302 of the Sarbanes-Oxley Act of 2002[9] (the "SOX 302 Certifications"),

signed by Defendants Pereira and McIntosh, certifying that:

1. I have reviewed this Quarterly Report on Form 10-Q of Alfi, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such

---

[9] SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.

internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

157.    Also attached as Exhibits 32.1 and 32.2 to Alfi's 1Q 2021 10-Q were

certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "SOX 906

Certifications"), signed by Defendants Pereira and McIntosh, which further certified that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

158.    The foregoing statements in ¶¶155-157 were materially false and/or misleading

for the same reasons as stated above in ¶154. In addition, the statements made in ¶¶155-157 were

materially false and/or misleading when made and/or omitted to state material facts necessary to

make the statements not misleading because they failed to disclose the following adverse facts:

a.      That, as Alfi later admitted in connection with its Restatement, Alfi's internal controls over financial reporting were not effective as of the time these statements were issued and material weaknesses existed in the Company's internal controls over financial reporting.

b.      That, as Alfi later admitted in connection with its Restatement, the Company "does not have a sufficient complement of personnel commensurate with the accounting and reporting requirements of a public company."

c.      That, as Alfi later admitted in connection with its Restatement, these material weaknesses relate to inadequate controls concerning the segregation of certain accounting duties and the reconciliation and analysis of key accounts, and arose because, "as a pre-revenue private company recently formed," Alfi did not have the "necessary personnel to design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company."

d.      That, as Alfi later admitted in connection with the conclusion of its Investigation, the former executives caused Alfi to enter into certain transactions and agreements, some of which included the issuance of Company stock, that were not approved by the Board; Defendant Pereira's made multiple inaccurate, misleading, and unapproved statements to the market during his tenure; and the former executives accessed and attempted to seize Alfi's computer systems after being placed on administrative leave.

e.      That, as Alfi later admitted in connection with the conclusion of its Investigation, Alfi's internal control over financial reporting was also deficient in many respects

as listed in ¶103, and that Alfi should work on enhancing its internal controls over financial reporting by following the recommendations listed in ¶104.

### 3. False And Misleading Statements And Omissions During And Following Defendant Pereira's Benzinga Interviews

159.    On June 16, 2021, Defendant Pereira appeared on Benzinga's "ZingerNation Power Hour" livestream show.[10] During the show, Defendant Pereira was asked to give more background on Alfi's future pipeline. In response, at approximately 12:19, Defendant Pereira stated that "as I speak today we have over 22,000 Uber Lyft drivers signed up waiting for deployment of Alfi tablets. In major cities right across the U.S."

160.    On June 17, 2021, Alfi published a press release confirming Defendant Pereira's statement, highlighting: "Excess of 20,000 Uber and Lyft drivers waiting for installation of Alfi screens[.]"

161.    Defendant Pereira's statement that Alfi had over 22,000 Uber & Lyft drivers "signed up" as of June 16, 2021 in ¶159 and Alfi's confirmation that over 20,000 drivers were "waiting for installation of Alfi screens" in ¶160 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because, as Alfi later admitted when it announced the findings of its Investigation, "the Investigation found that, at such time, such number of drivers had expressed interest in applying to secure contracts with the Company and, in June 2021, 1,253 drivers had contracts with the Company. Such statement was made without the Board's knowledge or approval."

162.    On June 22, 2021, a story written by Wayne Duggan entitled "EXCLUSIVE: Alfi

---

[10] This show is available at https://www.youtube.com/watch?v=OOoXywi5AWo (last accessed June 10, 2022). Defendant Pereira appears on the show at approximately 5:01 through 21:50.

Rally Continues Following $2M Buyback Announcement" was published on Benzinga.[11] The

story was published after an interview with Defendant Pereira, and stated in relevant part:

> **Alfi Inc** shares surged more than 50% Tuesday morning following a new buyback
> announcement and more encouraging commentary from the company's CEO.
>
> **What Happened?** Alfi announced a new $2 million buyback plan.
>
> "We will continue to buy back our stock as [a] firm commitment to our company
> valuation," CEO Paul Pereira told Benzinga Tuesday. "Our commitment to a tight
> float and our retail base is unwavering."

163.    The statement above in ¶162 was materially false and/or misleading when made

and/or omitted to state material facts necessary to make the statements not misleading, because,

as Alfi later admitted when it announced the findings of its Investigation, "[t]he disclosure to

Benzinga of a share repurchase program by the Company was made without the Board's

knowledge or approval[,]" and the Board *subsequently* approved such a share repurchase

program of up to $2 million in shares of Alfi common stock on June 23, 2021.

### 4.    False And Misleading Statements And Omissions in Alfi's 2Q 2021 Financial Results

164.    On August 16, 2021, Alfi filed its Form 10-Q for the quarter ended June 30, 2021

(the "2Q 2021 10-Q"), which was signed by Defendants Pereira and McIntosh on behalf of the

Company. Therein, Alfi reported a balance of: (1) $3,945,070 for the Company's intangible

assets; (2) $1,039,625 for the Company's "other assets (complimentary devices), net," *i.e.*, Alfi's

tablets; and (3) $26,317,348 for the Company's total stockholders' equity. The 2Q 2021 10-Q

also reported a net loss of $4,692,471.

165.    Item 2, Management's Discussion and Analysis of Financial Condition and

Results of Operations, in the 2Q 2021 10-Q stated: "Our management's discussion and analysis

---

[11]    https://www.benzinga.com/news/21/06/21666811/exclusive-alfi-rally-continues-following-
2m-buyback-announcement (last accessed June 10, 2022).

of our financial condition and results of operations are based on our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP."

166.     The foregoing statements in ¶¶164-165 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.     That Alfi's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated.

b.     That the Company's financial statements for the 2Q 2021 had materially overstated Alfi's balances for its intangible assets (*i.e.*, its technology), other assets (*i.e.*, tablets), and stockholders' equity and materially misstated Alfi's net loss.

c.     That, as Alfi later admitted in connection with the Restatement, the correction of the aforementioned errors and the additional unexplained accounting adjustments would result in a decrease of net loss by $390,749, to a restated net loss of $4,301,722, and decreased Alfi's stockholders' equity balance by $4,187,449, to a restated stockholders' equity balance of $22,129,899.

d.     That, as Alfi later admitted in connection with the Restatement, "[t]he Company incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of … June 30, 2021[.]" The correction of this error decreased Alfi's intangible asset balance by $3,144,811, to a restated balance of $800,259.

e.     That, as Alfi later admitted in connection with the Restatement, "[t]he Company overstated the carrying value of tablets by incorrectly reporting them at cost with no

allowance for depreciation, resulting in an overstatement of other assets (complimentary

devices), net, in its balance sheets as of … June 30, 2021[.] The correction of this error decreased

Alfi's reported balance for its tablets by $1,039,625 to a restated balance of $0.

    f.  That, as Alfi later admitted in connection with the Restatement, "[t]he

Company did not recognize and report on its balance sheets as of … June 30, 2021, an office

lease in accordance with" GAAP.

   167. The 2Q 2021 also stated: "*Office Condo*: The Company signed a contract to

acquire additional office space for $1,100,000 in Miami Beach, FL on July 12, 2021. The

purchase is expected to close late August."

   168. The statement above in ¶167 was materially false and/or misleading when made

and/or omitted to state material facts necessary to make the statements not misleading, because it

failed to disclose, among other things, that, as Alfi admitted in connection with the Investigation

and the Restatement, Alfi's "former senior management" caused Alfi to purchase this condo

without the Board's knowledge or approval. Specifically, in order to purchase the condo,

Defendant Pereira "signed a certification filed with Miami-Dade County which incorrectly stated

that the Board and the Company's stockholders approved the purchase." The condo was then

transferred to a newly formed limited liability company controlled by Defendants Pereira and

McIntosh, without the Board's knowledge or approval. During the Investigation, this condo was

transferred back to the Company and then sold for net proceeds of $990,000, *i.e.*, a net loss of

$110,000.

   169. Item 4 of Alfi's 2Q 2021 10-Q, entitled "Controls and Procedures," contained a

disclosure concerning the effectiveness of Alfi's controls and procedures that was substantively

identical to the Item 4 disclosure in Alfi's 1Q 2021 10-Q quoted in ¶155, except that it was "as of

June 30, 2021," rather than "as of March 31, 2021."

170.   Attached as Exhibits 31.1 and 31.2 were the SOX 302 Certifications of Defendants Pereira and McIntosh, respectively, which were substantively identical to the SOX 302 Certifications contained in the 1Q 2021 10-Q quoted in ¶156.

171.   Attached as Exhibits 32.1 and 32.2 were the SOX 906 Certifications of Defendants Pereira and McIntosh, respectively, which were substantively identical to the SOX 906 Certifications contained in the 1Q 2021 10-Q quoted in ¶157.

172.   The foregoing statements in ¶¶169-171 were materially false and/or misleading for the same reasons as stated above in ¶¶166 and 168. In addition, the statements made in ¶¶169-171 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

a.      That, as Alfi later admitted in connection with its Restatement, Alfi's internal controls over financial reporting were not effective as of the time these statements were issued and material weaknesses existed in the Company's internal controls over financial reporting.

b.      That, as Alfi later admitted in connection with its Restatement, the Company "does not have a sufficient complement of personnel commensurate with the accounting and reporting requirements of a public company."

c.      That, as Alfi later admitted in connection with its Restatement, these material weaknesses relate to inadequate controls concerning the segregation of certain accounting duties and the reconciliation and analysis of key accounts, and arose because, "as a pre-revenue private company recently formed," Alfi did not have the "necessary personnel to

design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company."

        d.      That, as Alfi later admitted in connection with the conclusion of its Investigation, the former executives caused Alfi to enter into certain transactions and agreements, some of which included the issuance of Company stock, that were not approved by the Board; Defendant Pereira's made multiple inaccurate, misleading, and unapproved statements to the market during his tenure; and the former executives accessed and attempted to seize Alfi's computer systems after being placed on administrative leave.

        e.      That, as Alfi later admitted in connection with the conclusion of its Investigation, Alfi's internal control over financial reporting was also deficient in many respects as listed in ¶103, and that Alfi should work on enhancing its internal controls over financial reporting by following the recommendations listed in ¶104.

**B.**    **Additional Allegations Regarding Defendants' Scienter**

    **1.**    **Defendant Pereira Has A History Of Engaging In The Types Of Actions Found In Alfi's Investigation**

173.   Prior to founding Alfi, Defendant Pereira served as the CEO and Executive Chairman of MHG, or Meridian Holdings Group, now known as Danimer Scientific. Defendant Pereira's bio in the Registration Statement states that at MHG, Pereira "spearheaded a turnaround from bankruptcy to a multi-million buyout offer in two years." However, in 2016, MHG sued Defendant Pereira for fraud, negligent misrepresentation, and breach of fiduciary duty of care and good faith, among others.[12] The operative complaint in the matter (Dkt. No. 84)

---

[12] *Meredian Holdings Group Inc., et al v. Pereira, et al*, 1:16-cv-00124-WLS (M.D. Ga) ("MHG Litigation").

states that by spring of 2015, Defendant Pereira had failed to, among other, make any meaningful

progress toward the completion of a turnaround plan or otherwise promote the success or

increase the value of MHG or Danimer.

174.   Rather, as the operative complaint alleges, through an investigation, MHG and

Danimer learned that "from the inception of the parties' relationship," Defendant Pereira

"engaged in a brazen pattern of improper conduct and self-dealing designed to enrich Pereira …

and which damaged [MHG and Danimer's] business and its relationships with existing and

potential customers and investors." The operative complaint then provides a list of the type of

conduct uncovered during the investigation, much of which rings strikingly familiar to the

findings of Alfi's Investigation.

175.   Among the improper conduct that MHG and Danimer learned of during the course

of their investigation includes that Defendant Pereira: (a) "[r]epeatedly altered [MHG and

Danimer's] projections and other company information in presentations and communications to

potential customers and/or investors in order to obtain their business;" (b) "[r]epeatedly and

purposefully disclosed confidential information of customers and/or potential customers in press

releases and presentations;" (c) repeatedly used company funds to reimburse Pereira "for

personal and non-business related expenses by misrepresenting that expense requests were for

business purposes"; (d) "[r]epeatedly wasted [MHG and Danimer's] money on non-essential and

useless endeavors, including establishing an office in Miami, Florida (which was used by Pereira

… for business unrelated to [p]laintiffs), hiring personal friends …, paying for trips abroad for

Pereira's son's friends, and retaining a marketing firm at an exorbitant rate whose primary

purpose was to promote Pereira" and (e) "[r]epeatedly engaged in self-dealing, including

retaining and causing substantial fees to be paid to defendant The House of Miami, a company

owned and controlled by Pereira and his wife, for graphic design and other services that were unnecessary and/or exorbitant, and the fees for which went directly to Pereira and his wife[.]"

176.   The plaintiffs in the MHG Litigation demanded injunctive relief to enjoin and/or restrain Defendant Pereira from selling or otherwise transferring his shares and/or stock options in the companies because, *inter alia*, Defendant Pereira did not have lawful possession of the stock. Despite the stock being a central issue in the litigation, during the middle of litigation, Defendant Pereira "decided" that his "20% ownership of non-dilutive shares are for sale[,]" making this announcement by directly posting to MHG and Danimer's Facebook page. MHG Litigation, Dkt. No. 70-2 at ¶23.[13] Defendant Pereira's Facebook post during the MHG Litigation is, again, similar to Alfi's Investigation findings that social media posts made from Defendant Pereira's computer included inaccurate statements.

177.   In addition, while Alfi's Investigation found that Defendant Pereira made two false and misleading statements during interviews with Benzinga in June 2021, a third, earlier June 2021 interview with Benzinga makes clear that Defendant Pereira knew what he should and should not say to the market, but decided to do so anyways in order to hype Alfi.

178.   On June 2, 2021, Pereira made another appearance on Benzinga's "ZingerNation Power Hour" livestream show.[14] During the show, Defendant Pereira was asked about some of the other uses of Alfi's platform besides being placed in rideshares, to which he started by listing a couple airport kiosks, and then said "… and also malls, I'm not sure if I can talk about all that

---

[13] Defendant Pereira's wife reshared this post on her Instragram account, @thehouseofmiami, and tagged Defendant Mowser, among others, in the post. *See* https://www.instagram.com/p/BwdF6fJnjaf/ (last accessed June 10, 2022).

[14] This show is available at https://www.youtube.com/watch?v=KqElhcNYR7M&t=2334s (last accessed June 8, 2022). Defendant Pereira appears on the show at approximately 38:54 through 57:35.

stuff yet but ….." After being encouraged that he could "break some news" on the show,

Defendant Pereira continued: "I'm probably gonna get waxed for this but yeah, we're actually

rolling out in some pretty exciting places with contracts pretty much in our hand."[15] Later in the

show, Defendant Pereira further stated, "because we have kiosks running in American Eagle

Outfitters right now, um, oops, I wasn't supposed to say that, but anyways …."[16]

> ## 2. Alfi Tracked Both Rideshare Drivers' Interest In Alfi Tablets As Well As Drivers That Had Signed A Contract With Alfi In A Single Spreadsheet

179.   According to Former Employee 1 ("FE1"),[17] Alfi used a "glorified spreadsheet" to

internally track rideshare driver information. This spreadsheet included all drivers that had

expressed interest, but also tracked other information about the drivers if applicable, such as

whether personal information had been collected and whether the driver had signed a contract

with Alfi. FE1 confirmed the Investigation findings, commenting that only approximately 1,200

drivers "signed up" sounded more accurate, and explained that there could have been 22,000

drivers that expressed interest, which would be, for example, the equivalent of 22,000 people

liking a social media post about a music festival, but only 1,000 people purchasing tickets.

180.   FE1 was unsure of whether Defendant Pereira was organized enough to access the

spreadsheet, but stated that Defendant Pereira was definitely updated on the contents of the

spreadsheet, and that numerous people accessed and input data into the spreadsheet.

181.   FE1 further commented that there was internal agreement among employees that

---

[15] At approximately 45:50-46:13.

[16] At approximately 55:15.

[17] FE1 was employed by Alfi as a project manager from June 2020 until August 2021. FE1 mostly worked with, and reported to, Defendant Cook, Alfi's Chief Business Development Office in the Miami, FL headquarters.

Defendant Pereira was "wacky" and "overconfident" in his projection of numbers.

### 3.    Corporate Scienter Allegations

182.   The Company is liable for the acts of the Individual Defendants and its other employees and agents, including under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

183.   The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

184.   Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Alfi as an entity. Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Here, the statements alleged were made to the investing public regarding the Company's operations, internal controls, finances and business practices—all important topics that would necessarily require approval by appropriate corporate officers.

### C.    Loss Causation

185.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

186.   During the Class Period, Plaintiffs and the Class purchased Alfi securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

187.   Artificial inflation in Alfi's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on October 28, 2021, November 15, 2021, and March 11, 2022. As a direct result of these partial disclosures, the price of Alfi's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

188.   On October 28, 2021, after the close of market, Alfi announced that on October 22, 2021, the Board had placed Defendant Pereira, Defendant McIntosh, and Charles Pereira on paid administrative leave and authorized an "independent internal investigation regarding certain corporate transactions and other matters." Alfi further announced that on October 28, 2021, Charles Pereira's employment with the Company was terminated.

189.   On this news, the Company's shares fell $1.24, or approximately 21.91%, to close at $4.42 on October 29, 2021, on unusually heavy trading volume.

190.   On November 15, 2021, after the market closed, Alfi announced that on November 9, 2021, the Company received a letter from the SEC notifying Alfi that all documents and data should be "reasonably preserved until further notice" because "the Company, its affiliates and agents may possess documents and data relevant to an ongoing investigation being conducted by the staff of the SEC."

191.   Also, in a separate filing with the SEC accepted after the close of market on November 15, 2021 and filed on November 16, 2021, Alfi stated that it was unable to timely file its quarterly report on Form 10-Q for the period ended September 30, 2021 due to the recent changes in its executive management and Board and Alfi not yet engaging a new independent public accounting firm to review the 3Q 2021 financials.

192.    On all this news, Alfi's stock price fell $0.24, or 5.21%, to close at $4.37 per share on November 16, 2021.

193.    On March 11, 2022, after the close of market, Alfi announced that the Company's previously issued audited results for the years ended December 31, 2019 and 2020, included in Alfi's Registration Statement, and the Company's previously issued quarterly financial statements on Form 10-Q for the quarterly periods ended March 31, 2021 and June 30, 2021 should no longer be relied upon and should be restated.

194.    Alfi further explained that in connection with its internal investigation, it identified the following accounting errors:

(i)   The Company incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

(ii)  The Company overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

(iii) The Company overstated total assets and total liabilities as of December 31, 2020, by incorrectly recording a note receivable (related parties) and a liability included in current portion of long-term debt (related parties). This note receivable represents a bridge loan provided to the Company by certain related parties that was executed in December 2020 but not fully funded until April 2021.

(iv) The Company did not recognize and report on its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021, an office lease in accordance with Financial Accounting Standards Board Accounting Standards Update No. 2018-11, Leases (Topic 842).

195.    Alfi preliminarily expected that Alfi's total stockholders' equity balances would decrease by $1.5 million as of December 31, 2019, by $2.9 million as of December 31, 2020, and by approximately $3.0 million as of June 30, 2021, but that the effects of the above errors on net

800915.2

income and total stockholders' equity (the Company's net worth or book value) was still being determined.

196.    Alfi also stated that it expected to conclude that material weaknesses in its internal controls over financial reporting for the periods covered by these accounting errors and that Alfi's disclosure controls and procedures for such periods were not effective.

197.    On all this news, Alfi's stock price fell $0.13, or 8.075%, to close at $1.48 per share on March 14, 2022, the first trading day after this news was released.

### D.    Applicability Of The Presumption Of Reliance (Fraud-On-The-Market Doctrine)

198.    The market for Alfi's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Alfi's securities traded at artificially inflated prices during the Class Period. On June 28, 2021, the Company's share price closed at a Class Period high of $18.59 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Alfi's securities and market information relating to Alfi, and have been damaged thereby.

199.    During the Class Period, the artificial inflation of Alfi's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Alfi's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Alfi and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

200.   At all relevant times, the market for Alfi's securities was an efficient market for the following reasons, among others:

   a.   Alfi securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

   b.   As a regulated issuer, Alfi filed periodic public reports with the SEC and/or the NASDAQ;

   c.   Alfi regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

   d.   The average daily trading volume for Alfi securities during the Class Period was approximately 5,843,542 shares with more than 16.069 million shares of common stock and 969,385 warrants outstanding as of December 31, 2021, and a market capitalization reaching $229.68 million during the Class Period.

201.   As a result of the foregoing, the market for Alfi's securities promptly digested current information regarding Alfi from all publicly available sources and reflected such information in Alfi's share price. Under these circumstances, all purchasers of Alfi's securities during the Class Period suffered similar injury through their purchase of Alfi's securities at artificially inflated prices and a presumption of reliance applies.

202.   A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because the Class's claims are, in large part, grounded on Defendants' material

misstatements and/or omissions. Because this action involves Defendants' failure to disclose

material adverse information regarding the Company's business operations and financial

prospects—information that Defendants were obligated to disclose—positive proof of reliance is

not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the

sense that a reasonable investor might have considered them important in making investment

decisions. Given the importance of the Class Period material misstatements and omissions set

forth above, that requirement is satisfied here.

## VII.   CLASS ACTION ALLEGATIONS

203.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

purchased or otherwise acquired Alfi securities between May 4, 2021 and March 11, 2022,

inclusive (the "Class Period"), including persons and entities that acquired Alfi common stock

and/or warrants pursuant and/or traceable to the Registration Statement issued in connection with

the Company's IPO, and were damaged thereby (the "Class"). Excluded from the Class are

Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in

which Defendants have or had a controlling interest.

204.   The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Alfi's shares actively traded on the NASDAQ.

While the exact number of Class members is unknown to Plaintiffs at this time and can only be

ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or

thousands of members in the proposed Class. Millions of Alfi shares were traded publicly during

the Class Period on the NASDAQ. As of December 31, 2021, Alfi had 16.069 million shares of common stock and 969,385 warrants outstanding. Record owners and other members of the Class may be identified from records maintained by Alfi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

205.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

206.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

207.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Alfi; and

c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

208.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

209.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

210.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

211.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Alfi who knew that the statement was false when made.

## IX.  CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation Of Section 11 Of The Securities Act
### (Against All Defendants)

212.   Plaintiffs repeat and re-allege the allegations contained in contained ¶¶1-147, 203-211, above as if fully set forth herein.

67

213.    This Claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the class who purchased or otherwise acquired Alfi common stock and/or warrants pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and were damaged thereby.

214.    This Count expressly excludes and disclaims any allegation of fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

215.    Liability under this Claim is predicated on Alfi's filing the Registration Statement, the Securities Act Individual Defendants' signing of the Registration Statement, and Defendants' respective participation in the IPO, which was conducted pursuant to the Registration Statement. The Registration Statement was false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

216.    Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

217.    By reason of the foregoing, the defendants named in this Claim are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class pursuant to Section 11(e).

### SECOND CLAIM
### Violation Of Section 15 Of The Securities Act
### (Against Defendants Pereira, McIntosh, Cook, Bordes, Lee, Elkouri, Ficken, Smith, And Mowser)

218.   Plaintiffs repeat and re-allege the allegations contained in contained ¶¶1-147, 203-217, above as if fully set forth herein.

219.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Pereira, McIntosh, Cook, Bordes, Lee, Elkouri, Ficken, Smith, and Mowser (the "Securities Act Individual Defendants").

220.   At all relevant times, the Securities Act Individual Defendants were controlling persons of Alfi within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions at Alfi and/or because of their positions on Alfi's Board, the Securities Act Individual Defendants had the requisite power to directly or indirectly control or influence the decision-making of the Company and the conduct of Alfi's business, including the wrongful conduct complained of herein.

221.   In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Pereira and McIntosh had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. They were also directly involved in providing false information and certifying and/or approving the false and/or misleading statements disseminated by Alfi during the Class Period. As a result of the foregoing, Defendants Pereira and McIntosh, as a group and individually, were controlling persons of Alfi within the meaning Section 15 of the Exchange Act.

222.   Defendants Pereira and McIntosh also each signed the Registration Statement in connection with the IPO, the Registration Statement was disseminated to the investing public,

and became effective. Thus, these defendants controlled the contents and dissemination of the Registration Statement.

223.    Similarly, Defendants Pereira, Cook, Bordes, Lee, Elkouri, Ficken, Smith, and Mowser served as Directors on Alfi's board of directors and Defendant McIntosh served as Alfi's "Principal Financial and Accounting Officer") at the time the IPO was conducted and at the time that the Registration Statement was signed. As directors of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to Alfi's financial condition and results of operations. These Securities Act Individual Defendants each signed the Registration Statement in connection with the IPO, the Registration Statement was disseminated to the investing public, and the Registration Statement became effective. Thus, these defendants controlled the contents and dissemination of the Registration Statement.

224.    This claim does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

225.    By reason of the aforementioned conduct, each of the defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class with claims pursuant to Section 11 of the Securities Act, as set forth above. As a direct and proximate result of the conduct of these Defendants, Plaintiffs and members of the Class suffered damages in connection with their purchase or acquisition of securities pursuant and/or traceable to the IPO.

### THIRD CLAIM
#### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder
#### Against Defendant Alfi, Defendant Pereira, And Defendant McIntosh

226.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully

set forth herein.

227.   During the Class Period, Defendants Alfi, Pereira, and McIntosh carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Alfi's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

228.   Defendants Alfi, Pereira, and McIntosh (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alfi's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants Alfi, Pereira, and McIntosh are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

229.   Defendants Alfi, Pereira, and McIntosh, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Alfi's financial well-being and prospects, as specified herein.

230.   Defendants Alfi, Pereira, and McIntosh employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alfi's value and performance and continued substantial growth, which included the making of, or the

71

participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alfi and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

231.   Each of Defendant Pereira's and Defendant McIntosh's (the "Individual Defendants") primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

232.   Defendant Alfi and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions

were done knowingly or recklessly and for the purpose and effect of concealing Alfi's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendant Alfi's and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendant Alfi and the Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

233.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Alfi's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant Alfi and the Individual Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendant Alfi and the Individual Defendants, but not disclosed in public statements by Defendant Alfi and the Individual Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Alfi's securities during the Class Period at artificially high prices and were damaged thereby.

234.   At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Alfi was experiencing, which were not disclosed by Defendant Alfi and the Individual

73

Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Alfi securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

235.    By virtue of the foregoing, Defendant Alfi and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

236.    As a direct and proximate result of Defendant Alfi's and the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**FOURTH CLAIM**
**Violation Of Section 20(a) Of The Exchange Act**
**Against Defendant Pereira And Defendant McIntosh**

237.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

238.    Defendant Pereira and Defendant McIntosh (the "Individual Defendants") acted as controlling persons of Alfi within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the

74

issuance of the statements or cause the statements to be corrected.

239. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

240. As set forth above, Alfi and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 13, 2022                    Respectfully submitted,

                                      **SAXENA WHITE P.A.**

                                      By: */s/ Adam D. Warden*
Joseph E. White, III (FL Bar No. 621064)
Adam D. Warden (FL Bar No. 873691)
Jonathan D. Lamet (FL Bar No. 106059)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com
awarden@saxenawhite.com
jlamet@saxenawhite.com

*Local Counsel for Lead Plaintiff and*
*Local Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (*pro hac vice*)
Leanne H. Solish (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
lsolish@glancylaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq., Fla. Bar No. 0182877
Phillip Kim, Esq. (*pro hac vice*)
Ha Sung (Scott) Kim (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
skim@rosenlegal.com

*Counsel for Plaintiff John K. Allen,*
*on behalf of the Joseph M. Driscoll Trust, and*
*Plaintiff Alexander C. Takian*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Lead Plaintiff*

800915.2

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2022, I presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system.


*s/ Adam D. Warden*
Adam D. Warden