**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| CANDIDO RODRIGUEZ, Individually and on behalf of All Others Similarly Situated, | Case No. 1:21-cv-24232-KMW |
| Plaintiff, | |
| v . | |
| ALFI, INC., PAUL ANTONIO PEREIRA, DENNIS MCINTOSH, JOHN M. COOK, II, PETER BORDES, JIM LEE, JUSTIN ELKOURI, ALLISON FICKEN, FRANK SMITH, RICHARD MOWSER, KINGSWOOD CAPITAL MARKETS, REVERE SECURITIES LLC, and WESTPARK CAPITAL, INC., | |
| Defendants, | |

**MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT & INCORPORATED MEMORANDUM OF LAW**

James H. Cummings (FBN 27657)
**SMITH, GAMBRELL & RUSSELL, LLP**
Bank of America Tower, Suite 2600
50 North Laura Street
Jacksonville, FL 32202
Tel:  (904) 598-6127
Fax:  (904) 598-6300
jcummings@sgrlaw.com

Dan F. Laney (*pro hac vice*)
Austin J. Hemmer (*pro hac vice*)
**SMITH, GAMBRELL & RUSSELL, LLP**
1105 West Peachtree St. N.E., Suite 1000
Atlanta, GA 30309
Tel: (404) 815-3500
Fax: (404) 815-3509
dlaney@sgrlaw.com
ahemmer@sgrlaw.com

*Counsel for Defendants Alfi, Inc., John M. Cook, II, Peter Bordes, Jim Lee, Justin Elkouri, Allison Ficken, and Frank Smith*

**TABLE OF CONTENTS**

Page(s)

REQUEST FOR ORAL ARGUMENT ........................................................................... vi

INTRODUCTION ............................................................................................................. 1

SUMMARY OF ALLEGATIONS .................................................................................... 2

ALLEGED MISREPRESENTATIONS ............................................................................ 8

ARGUMENT AND CITATION OF AUTHORITIES ...................................................... 9

I.      PLEADING STANDARDS ...................................................................................... 9

      A.    Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) ..................... 9

      B.    Claims under the Securities Exchange Act of 1934 (the "Exchange Act") .......... 10

      C.    Claims under the Securities Act of 1933 (the "Securities Act") .......................... 10

II.     THE COMPLAINT IS AN IMPROPER SHOTGUN PLEADING ................................. 11

III.    THE COMPLAINT ALLEGES MISMANAGEMENT, NOT SECURITIES FRAUD .. 13

IV.    THE EXCHANGE ACT CLAIM FAILS ................................................................ 14

      A.    The Complaint fails to allege a strong inference of scienter ............................... 14

      B.    The Complaint fails to allege loss causation ...................................................... 18

            i.     The October 28, 2021 Form 8-K .............................................................. 18

            ii.    The November 15, 2021 Form 8-K ............................................................ 20

            iii.   The November 16, 2021 Form 8-K ............................................................ 21

            iv.   The March 11, 2022 Form 8-K .................................................................. 21

      C.    The Complaint does not specify why each alleged misstatement is misleading .. 23

      D.    The alleged misstatements are not material ........................................................ 24

V.     THE SECURITIES ACT CLAIMS FAIL ............................................................... 27

      A.    Alfi warned of the risk in the Registration Statement ......................................... 27

      B.    The alleged misstatements are not material ........................................................ 28

      C.    Plaintiffs' alleged losses are not attributable to the alleged misstatements .......... 29

      D.    Plaintiffs' Section 15 control person claim fails ................................................. 29

CONCLUSION ............................................................................................................... 29

i

## **TABLE OF AUTHORITIES**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ......................................................................................... 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 9, 16

*Barilli v. Sky Solar Holdings, Ltd.*,
   389 F. Supp. 3d 232 (S.D.N.Y. 2019) ...................................................................... 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 9, 11, 16

*Carvelli v. Ocwen Fin. Corp.*,
   9:17-CV-80500-RLR, 2018 WL 4941110  (S.D. Fla. Apr. 30, 2018) ...................... 13

*Carvelli v. Ocwen Fin. Corp.*,
   934 F. 3d 1307 (11th Cir. 2019) ............................................................................... 24

*Chudasama v. Mazda Motor Corp.*,
   123 F.3d 1353 (11th Cir. 1997) ................................................................................ 11

*City of St. Clair Shores Gen. Employees' Ret. Sys. v. Lender Processing Servs., Inc.*,
   3:10-CV-1073-J-32JBT, 2012 WL 1080953 (M.D. Fla. Mar. 30, 2012) ................ 16

*Cramer v. State of Fla.*,
   117 F.3d 1258 (11th Cir. 1997) ................................................................................ 11

*Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*,
   8:04CV2561T-24EAJ, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ........................ 29

*Drucker v. Just for Feet Inc.*,
   CV 97-B-1578-S, 2000 WL 36733071 (N.D. Ala. Sept. 29, 2000) ............... 13, 25, 26

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................ 18, 19, 20, 22

*Fidel v. Rampell*,
   02-61258-CIV-MARRA, 2005 WL 5587454 (S.D. Fla. Mar. 29, 2005) ................. 16

*FindWhat Inv'r Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ........................................................................ 3, 17, 18

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir.2006) ................................................................................. 23

*Hildes v. Arthur Andersen, LLP,*
   734 F.3d 854 (9th Cir. 2013) ................................................................................. 29

*Hoffman v. Authentec, Inc.*,
   608CV-1741-ORL-28DAB, 2009 WL 3109860 (M.D. Fla. Sept. 24, 2009) ........................ 23

*In re Craftmatic Sec. Litig.*,
   890 F.2d 628 (3rd Cir. 1989) ................................................................................. 13

*In re Greenlane Holdings, Inc. Sec. Litig.,*
   511 F. Supp. 3d 1283 (S.D. Fla. 2021) ..................................................................... 27

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
   16-CV-60165-WPD, 2016 WL 10592320  (S.D. Fla. June 6, 2016) ..................................... 20

*In re KLX, Inc. Sec. Litig.*,
   232 F. Supp. 3d 1269 (S.D. Fla. 2017) ..................................................................... 25

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,*
   289 F.Supp.2d 429 (S.D.N.Y.2003) .................................................................... 3, 29

*In re ProShares Tr. Sec. Litig.,*
   728 F.3d 96 (2d Cir. 2013) ............................................................................ 27, 28

*In re Royal Caribbean Cruises Ltd. Sec. Litig.,*
   1:11-22855-CIV, 2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ........................................ 14

*In re TECO Energy, Inc. Sec. Litig.*,
   8:04-CV-1948-T-27EAJ, 2006 WL 845161  (M.D. Fla. Mar. 30, 2006) ............................... 18

*In re Winn-Dixie Stores, Inc. Sec. Litig.*,
   531 F. Supp. 2d 1334 (M.D. Fla. 2007) .............................................................. 16, 23

*La Grasta v. First Union Sec., Inc.*,
   358 F.3d 840 (11th Cir. 2004) ................................................................................ 3

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
   547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ................................................ 15

*Meyer v. Greene,*
   710 F.3d 1189 (11th Cir. 2013) ................................................................ 18, 19, 20, 21

*Miyahira v. Vitacost.com, Inc.*,
   715 F.3d 1257 (11th Cir. 2013) ................................................................ 26, 28, 29

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ................................................................ 10, 14, 15, 17

*Pelletier v. Zweifel*,
  921 F.2d 1465 (11th Cir. 1991) .................................................................................. 11, 12

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015) ............................................................................. 16

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) ......................................................................................................... 13

*Tabor v. Bodisen Biotech, Inc.*,
  579 F. Supp. 2d 438 (S.D.N.Y. 2008) .............................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................................... 15

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  1:14-CV-20880-UU, 2014 WL 11961964  (S.D. Fla. Dec. 23, 2014) .................................... 16

*Wagner v. First Horizon Pharm. Corp.*,
  464 F.3d 1273 (11th Cir. 2006) ..................................................................... 10, 11, 12, 13, 24

*Waters v. Gen. Elec. Co.*,
  No. 08 CIV. 8484 RJS, 2010 WL 3910303  (S.D.N.Y. Sept. 29, 2010) .................................. 20

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .............................................................................. 22, 23, 29

**Statutes**

15 U.S.C. § 77k(e) .............................................................................................................. 29

15 U.S.C. § 77o .................................................................................................................. 29

15 U.S.C. § 78u-4(b)(1) ................................................................................................. 10, 23

15 U.S.C. § 78u-4(b)(2) ................................................................................................. 10, 14

15 U.S.C. § 78u-4(b)(3) ...................................................................................................... 10

15 U.S.C. § 78u-4(b)(3)(A) ................................................................................................. 23

15 U.S.C. § 78u-4(b)(4) ...................................................................................................... 22

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ............................................................................. 1, 9

Federal Rule of Civil Procedure 12(e) ......................................................................... 1, 9, 11, 13

Federal Rule of Civil Procedure 8(a)(2) ................................................................ 11, 12

Federal Rule of Civil Procedure Rule 9(b).......................................................... passim

**Other Authorities**

Nasdaq's website: https://www.nasdaq.com/market-activity/stocks/alf/historical......................... 3

Yahoo's website:
https://finance.yahoo.com/quote/ALF/history?period1=1502409600&period2=1660176000&i
nterval=1d&filter=history&frequency=1d&includeAdjustedClose=true .................................. 3

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(b)(2), Defendants Alfi, Inc., John M. Cook, II, Peter Bordes, Jim Lee, Justin Elkouri, Allison Ficken, and Frank Smith hereby respectfully request oral argument on their Motion to Dismiss the Amended Consolidated Class Action Complaint or, in the Alternative, for a More Definite Statement. The Complaint asserts claims for significant damages, and the Motion raises important arguments concerning complex issues involving the federal securities laws. These Defendants believe that the Court's decision-making process would be significantly aided by oral argument permitting the Court to engage with counsel and inquire into the issues presented. These Defendants estimate that a total of two and one half (2.5) hours, for all parties, would be necessary for argument, given the number of issues and the fact that there are multiple parties with different counsel.

**SMITH GAMBRELL & RUSSELL LLP**

*/s/ James H. Cummings*
James H. Cummings (FBN 27657)
Bank of America Tower, Suite 2600
50 North Laura Street
Jacksonville, FL 32202
Tel:  (904) 598-6127
Fax:  (904) 598-6300
jcummings@sgrlaw.com

Dan F. Laney (*pro hac vice*)
Austin J. Hemmer (*pro hac vice*)
1105 West Peachtree St. N.E., Suite 1000
Atlanta, GA 30309
Tel: (404) 815-3500
Fax: (404) 815-3509
dlaney@sgrlaw.com
ahemmer@sgrlaw.com

*Counsel for Defendants Alfi, Inc., John M. Cook, II, Peter Bordes, Jim Lee, Justin Elkouri, Allison Ficken, and Frank Smith*

Defendants Alfi, Inc. ("Alfi"), John M. Cook, II, Peter Bordes, Jim Lee, Justin Elkouri, Allison Ficken, and Frank Smith (collectively, the "Moving Defendants") respectfully move for the entry of an order dismissing the Amended Consolidated Class Action Complaint (the "Complaint") under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, requiring Plaintiffs to re-plead under Federal Rule of Civil Procedure 12(e).

## INTRODUCTION

The Complaint is a confusing shotgun pleading that essentially boils down to allegations that Alfi, a small startup company, had poor management and did not have adequate internal controls. As the United States Supreme Court has cautioned, the district courts must ensure that such allegations of corporate mismanagement are not improperly converted into federal securities fraud claims. Indeed, although the Complaint is an improper shotgun pleading that must be re-pleaded under binding Eleventh Circuit precedent, one thing is clear—there are no actionable misrepresentations here. Alfi expressly told the market that, as a small startup, it may not be able to implement adequate internal controls and that management may experience difficulties in transitioning from a small, private startup to a public company.

The fact of the matter is, while Alfi has a very creative product, it never earned any substantial revenues during the Class Period. And Plaintiffs do not and cannot properly allege that it is more probable than not that it was any alleged "corrective disclosure" of an alleged misrepresentation that caused Alfi's stock price to fall rather than the fact that this small startup was simply not earning any revenues. Indeed, when the primary "corrective disclosure" (one Plaintiffs tellingly avoid) was made on February 23, 2022, detailing the findings of an internal investigation discussing the matters alleged in the Complaint, ***the stock price went up for three full trading days for a 62% gain.*** There is no fraud here. Plaintiffs' shotgun Complaint is exactly what the Eleventh Circuit forbids, what Congress was concerned about when it passed the Private Securities Litigation Reform Act, and what the Supreme Court has warned trial courts to guard against, as discussed in more detail below.

1

## SUMMARY OF ALLEGATIONS[1]

Alfi is a small, start-up company.  It uses proprietary, facial recognition and artificial intelligence technology to deliver targeted advertising to the viewer of an Alfi-enabled device, such as a tablet or a kiosk, based on the viewer's demographics and geolocation.  At the same time, Alfi also provides advertisers with "real time, accurate and rich reporting on customer demographics, usage, interactivity and engagement while never storing any personal identifiable information." (Complaint at ¶¶ 53-54.)

On or about January 8, 2021, Alfi filed with the SEC its registration statement on Form S-1, which would later be utilized in its initial public offering following multiple amendments on Forms S-1/A, the last of which was filed on April 26, 2021 and declared effective by the SEC on May 3, 2021.  (*Id.* at ¶ 57.)  Alfi then completed its initial public offering on May 6, 2021, with a public offering price of $4.15 per share.  (*Id.* at ¶¶ 58-59.)

On May 17, 2021, Alfi announced that it was resuming the rollout of its tablets in rideshares (*e.g.,* Uber and Lyft) in Miami and ten other major U.S. cities after a delay due to the COVID-19 pandemic.  (*Id.* at ¶ 62.)  On June 16, 2021, Alfi's Chief Executive Officer and founder, individual Defendant Pereira, appeared on Benzinga, an online streaming news service, and stated, "as I speak today we have over 22,000 Uber Lyft drivers signed up waiting for deployment of Alfi tablets. In major cities right across the U.S." (*Id.* at ¶ 65.)  Alfi issued a press release on June 17, 2021, which included a bullet point stating: "Excess of 20,000 Uber and Lyft drivers waiting for installation of Alfi screens."  (*Id.* at ¶ 66.)

On June 22, 2021, Benzinga reported that Alfi was announcing a $2 million stock buyback. (*Id.* at ¶ 68.)  That same day, Alfi filed a Form 8-K with the SEC referencing the Benzinga article and the anticipated buyback, and on June 23, 2022, Alfi filed an additional Form 8-K announcing that the Board had "authorized and approved" a share repurchase program for up to $2 million of its common stock.  (*Id.* at ¶ 69.)  Alfi's share price hit an all-time high on June 28, 2021, closing at $18.59 per share.  (*Id.* at ¶ 71.)

Since its IPO, however, Alfi ***never generated any substantial revenues*** during the Class Period, a fact disclosed in Form 10-Q's filed on June 10, 2021 and August 16, 2021.  (*See* Form

---

[1] Moving Defendants include Plaintiffs' allegations in this summary, which must be taken as true for the purposes of this Motion. Moving Defendants dispute many of these allegations.

10-Q's attached as Exhibits 1 & 2 hereto, respectively, at page 3; Complaint at ¶¶ 151 & 164.)[2] And following the stock buyback, Alfi's stock price fell steadily throughout the summer to close at $6.56 on the last trading day of September.  (Alfi's Historical Stock Quotes are attached hereto as Exhibits 3a and 3b (*see* Ex. 3a at 2-4).)[3]  This sustained drop in the stock price following the buyback is not alleged to have resulted from any alleged misrepresentations.

On October 28, 2021, Alfi filed a Form 8-K after trading hours announcing that the Board had on October 22 "placed each of Paul Pereira, the Company's President and Chief Executive Officer, Dennis McIntosh, the Company's Chief Financial Officer and Treasurer, and Charles Pereira, the Company's Chief Technology Officer, on paid administrative leave and authorized an independent internal investigation regarding certain corporate transactions and other matters." (*Id*. at ¶ 72; a copy of the October 28, 2021 Form 8-K is attached hereto as Exhibit 4). This filing did not identify the matters to be investigated.  (*Id.*)  On October 29, 2021, the next trading day, Alfi's stock price fell $1.24 to close at $4.42.  (*Id.* at ¶ 75; Ex. 3a at 4.)

On November 1, 2021, Alfi filed a Form 8-K after trading hours disclosing, among other things, detail regarding the scope of the investigation authorized by the Board, which included (i) Alfi's purchase of a condominium (which purchase had been disclosed in the August 16, 2021 Form 10-Q) and an erroneously certified corporate resolution regarding the unanimous approval by the Board and Alfi's stockholders of such purchase; and (ii) Alfi's commitment to sponsor a sports tournament in the amount of $640,000, for which there may not have been Board approval.  (*Id.* at ¶¶ 80-82; a copy of the November 1, 2021 Form 8-K is attached hereto as Exhibit 5.)  This Form 8-K also stated that "one of the goals of the independent internal

---

[2] A district court may consider extrinsic documents central to or referenced in the complaint and may also take judicial notice of documents filed with the SEC in ruling on a motion to dismiss. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1297 (11th Cir. 2011).

[3] Courts may take judicial notice of published stock prices on a motion to dismiss.  *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (all stock prices should be considered when the complaint lists prices on only certain days and "[t]hose prices are not subject to reasonable dispute, and are a proper subject for judicial notice").  The prices in Ex. 3a were downloaded from and are available here on the Nasdaq's website: https://www.nasdaq.com/market-activity/stocks/alf/historical and the prices in Ex. 3b are from: https://finance.yahoo.com/quote/ALF/history?period1=1502409600&period2=1660176000&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true  (*See In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 289 F.Supp.2d 429, 437 (S.D.N.Y.2003) (considering stock prices from Yahoo finance).)

investigation is to help [Alfi] in developing improved corporate governance policies and procedures to ensure that the Board is provided the opportunity to consider and provide appropriate input to the Company's management on significant corporate transactions." (*Id.;* Ex. 5 at 5/6.)  Following this announcement detailing the scope of the previously announced investigation, Alfi's stock price ***rallied for the next four trading days from $4.48 to $5.31 for an 18.5% gain***.  (Ex. 3a at 4.)

On November 15, 2021, Alfi filed a Form 8-K with the SEC announcing that on November 9, 2021, Alfi had received a letter from the SEC indicating that Alfi may possess documents and data relevant to an ongoing investigation and notifying Alfi that such documents and data should be reasonably preserved.  (Complaint at ¶ 83; a copy of the November 15, 2021 Form 8-K is attached hereto as Exhibit 6.)  The materials to be preserved and retained included documents relating to the same subjects being investigated by the Special Committee, which had been disclosed on November 1, 2021. (*Id.*)

In a separate Form 8-K filing on November 16, 2021 (dated November 15), Alfi announced that it would be unable to file its Form 10-Q Quarterly Report for the quarter ended September 30, 2021 by the November 15, 2021 deadline due to the recent changes in its executive management and its Board and because it had not yet engaged a new independent registered accounting firm to provide the required review of the Company's financial statements to be filed as part of the Quarterly Report.  (*Id.* at ¶ 84; a copy of the November 16 Form 8-K is attached hereto as Exhibit 7.)  In that same Form 8-K, Alfi's new interim CFO stated that Alfi anticipated to report net revenues of just $112 for the quarter ended September 30, 2021, compared with net revenues of just $936 reported for the quarter ended June 30, 2021.  (Ex. 7 at 3.)  That day, Alfi's stock price fell from $4.61 to close at $4.37.  (Complaint at ¶ 85; Ex. 3a at 4.)

On February 23, 2022, Alfi filed a Form 8-K reporting the results of the aforementioned investigation by a Special Committee of the Board (the "Investigation").  (*Id.* at ¶ 87; a copy of the February 23, 2022 Form 8-K is attached hereto as Exhibit 8.)  The Investigation determined that the "Company's former senior management"[4] caused Alfi to purchase a condominium in Miami Beach, Florida for approximately $1.1 million without the Board's knowledge or

---

[4] Defendant Pereira and Defendant McIntosh resigned from all positions each held with the Company on February 2, 2022.  (Complaint at ¶ 89.)

approval, although the purchase had been disclosed in the June 10, 2021 Form 10-Q. (Ex. 8 at 3.) The condominium was transferred to a limited liability company controlled by Defendants Pereira and McIntosh, Defendants Pereira and McIntosh stated that the limited liability company was owned by Alfi and "was formed to serve as a special purpose entity in order to facilitate a loan for which the Condominium would serve as security; however, the Investigation found no documentary evidence with respect to the ownership of the LLC." (*Id.*) The condominium was transferred to Alfi, and Alfi began the process of selling the condominium. (*Id.*)

The Investigation also found that Mr. Pereira's disclosure to Benzinga of the buyback by Alfi was made without the Board's knowledge or approval, although the repurchase program was later approved by the Board. (*Id.*) The Investigation also found that Mr. Pereira stated during the June 15, 2022 Benzinga interview that the Alfi had over 22,000 rideshare drivers "signed up" but the Investigation found that such number of drivers had expressed interest in applying to secure contracts with Alfi at that time, and 1,253 drivers had contracts with Alfi. (*Id.* at 3.)

The Investigation found Alfi's internal control over financial reporting to be deficient with respect to:

> (i) the disbursement process for third-party vendors; (ii) the review and approval process for significant vendor contracts; (iii) the use of Company credit cards by executives; (iv) the supervision and approval of travel and entertainment expenses incurred by executives; (v) the segregation of duties in connection with the payment and recording of invoices and related bank reconciliations; (vi) the lack of a sufficient accounting manual; and (vii) guidelines for the capitalization of fixed assets.

(*Id.* at 4.) The Special Committee also made recommendations to enhance Alfi's internal controls over financial reporting. (*Id.* at 4.)

In this same filing, Alfi stated:

> The Company's management, under the supervision of the Audit Committee, is: (i) still in the process of evaluating the issues and findings identified in the Investigation and assessing the Company's internal control over financial reporting, including whether any identified deficiencies constitute material weaknesses in internal controls, and (ii) considering whether any restatement or adjustment to the Company's previously issued financial statements will be necessary. If it is determined that there are any material weaknesses in internal controls or that it will be necessary to restate or adjust the Company's previously issued financial statements, then the Company intends to make disclosure thereof on a Current Report on Form 8-K.

(*Id.* at 5.)

Following this filing that disclosed the findings of the Investigation, Alfi's stock price ***went up for three straight days*** from $1.48 on February 23 to close at $2.40 on February 28, for a **62% gain**. (Ex. 3a at 6.)

On March 11, 2022, Alfi filed a Form 8-K after trading hours stating that the Company's previously issued audited results for the years ended December 31, 2019 and 2020 (respectively, "FY 2019" and "FY 2020"), included in Alfi's Registration Statement, and its previously issued quarterly financial statements included in the 1Q 2021 and 2Q 2021 Form 10-Qs (Exs. 1 & 2 hereto, respectively) "should no longer be relied upon and should be restated as a result of the following identified accounting errors:

    i.    The Company incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

    ii.    The Company overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

    iii.    The Company overstated total assets and total liabilities as of December 31, 2020, by incorrectly recording a note receivable (related parties) and a liability included in current portion of long-term debt (related parties). This note receivable represents a bridge loan provided to the Company by certain related parties that was executed in December 2020 but not fully funded until April 2021.

    iv.    The Company did not recognize and report on its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021, an office lease in accordance with Financial Accounting Standards Board Accounting Standards Update No. 2018-11, Leases (Topic 842)."

(Complaint at ¶ 106; a copy of the March 11, 2022 Form 8-K is attached hereto as Exhibit 9.) Alfi stated that it was still determining the final restatements, but "[b]ased on the Company's review to date, the Company preliminarily expects that the restatement of the Company's previously issued audited financial statements for the years ended December 31, 2019 and 2020 will reflect the following estimated adjustments":

| (Dollars in Millions) | | December 31, | | |
|---|---|---|---|---|
| | | **2019** | | **2020** |
| **AS REPORTED** | | | | |
| **Consolidated Balance Sheet:** | | | | |
| Total assets | . | $ 3.4 | $ | 7.4 |
| Total liabilities | | $ 0.8 | $ | 6.4 |
| Total stockholders' equity | | $ 2.6 | $ | 1.0 |
| **RESTATED** | | | | |
| **Consolidated Balance Sheet:** | | | | |
| Total assets | | $ 2.1 | $ | 2.8 |
| Total liabilities | | $ 1.0 | $ | 4.7 |
| Total stockholders' equity | | $ 1.1 | ($ | 1.9) |
| **EFFECT OF ADJUSTMENTS** | | | | |
| **Consolidated Balance Sheet:** | | | | |
| Total assets | | ($ 1.3) | ($ | 4.6) |
| Total liabilities | | $ 0.2 | ($ | 1.7) |
| Total stockholders' equity | | ($ 1.5) | ($ | 2.9) |

(Ex. 9 at 2/5.)  Alfi also stated that it anticipated the financial statements attached to the June and August 2021 Form 10-Qs "would also be affected by the restatements to correct these errors" and offered some preliminary expectations regarding the effects.  (*Id.* at 3/5.)  Alfi also stated that the "adjustments on earnings reported for 2021 interim periods is not material because the Company did not continue to capitalize expenses and report them as additions to intangible assets after December 31, 2020."  (*Id.*)  Alfi also stated that due to these matters, it "expected to conclude that material weaknesses existed in the Company's internal control over financial reporting for the periods covered by the Prior Period Financial Statements and that the Company's disclosure controls and procedures for such periods were not effective." (*Id.*)

Finally, regarding Alfi's financial condition, Alfi stated that "[s]ince its inception, the Company has generated only nominal revenue from customers and business activity and currently has very limited cash on hand" and identified steps it was taking to acquire funds and also disclosed the risk that it may not be successful in acquiring funds and may have to take actions, including bankruptcy.  (*Id.* at 4/5.)

The next trading day, Monday, March 14, 2022, Alfi's stock price did decline slightly from $1.61 to $1.48, but quickly recovered on March 15, 16, and 17 to close at $1.80 per share on March 17 for an ***11.8% gain***, and it never again closed below its March 11 price of $1.61 until weeks later on April 8, 2022, after the end of the Class Period.  (Ex. 3a at 7.)

On May 16, 2022, also after the end of the Class Period, Alfi issued two Form 10-Q/As for 1Q 2021 and 2Q 2021 (the "1Q 2021 10-Q/A" and the "2Q 2021 10-Q/A", respectively).  (Complaint at ¶ 110.)  Also on this day, Alfi issued its Form 10-K for the 2021 fiscal year (the

"2021 10-K"), which included accompanying restated financial statements for the 2019 and 2020 fiscal years (the 2019 and 2020 fiscal year restatement in the 2021 10-K, together with the 1Q 2021 10-Q/A and 2Q 2021 10-Q/A are referred to in the Complaint as the "Restatement"). (*Id.*) In the Restatement, Alfi's financial statements for the years ended December 31, 2019 and 2020 and the quarters ended March 31, 2021 and June 30, 2021 were restated to correct the four accounting errors identified on March 11, 2022. (*Id.* at ¶ 111.)

In connection with the Restatement, Alfi also stated in its May 16 filing (again, after the class period) that management believed Alfi's internal controls over financial reporting and disclosure controls and procedures were ineffective and that material weaknesses exist in Alfi's internal controls over financial reporting. (*Id.* at ¶ 113.) Alfi stated that management had concluded: (1) Alfi "does not have a sufficient complement of personnel commensurate with the accounting and reporting requirements of a public company"; and (2) as a pre-revenue private company recently formed, Alfi did not have the "necessary personnel to design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company." (*Id.* at ¶ 114.) Following these filings, on the next trading day, Alfi's stock price ***went up 5.7%*** from $1.23 per share to close at $1.30 per share on May 17, 2022. (Ex. 3a at 8.)

## ALLEGED MISREPRESENTATIONS

Plaintiffs appear to allege that 21 different statements were false and/or misleading. Attached hereto as Exhibit 10 is a chart of the alleged misrepresentations, which can be categorized as follows:

a. The accounting errors identified in the March 11, 2022 Form 8-K relating to the Financial Statements for Fiscal Years 2019 and 2020 attached to the Registration Statement (Statements 1-2).

b. Statements in the Registration Statement that the Financial Statements for 2019 and 2020 were prepared in accordance with GAAP (Statements 3-4).

c. Statements in the Registration Statement regarding Alfi's internal control over financial reporting and disclosure controls and procedures (Statements 5-6).

d. The accounting errors identified in the March 11, 2022 Form 8-K relating to the Financial Statements for Q1 2021 and Q2 2021 (Statements 7 & 16).

e.   Statements in the Q1 2021 and Q2 2021 Form 10-Qs stating that they had been
    prepared in accordance with GAAP (Statements 8-9 & 17).

f.   Statements in the Q1 2021 and Q2 2021 Form 10-Qs and in Sarbanes-Oxley
    Certifications by Mr. Pereira and Mr. McIntosh (Statements 10-12 & 19-21).

g.   Statements regarding rideshare drivers waiting for Alfi tablets (Statements 13-14).

h.   The June 22, 2021 Benzinga article announcing Alfi's stock buyback (Statement 15).

i.   Alfi's disclosure in the August 16, 2021 Form 10-Q regarding the purchase of the
    condominium (Statement 18).

<u>**ARGUMENT AND CITATION OF AUTHORITIES**</u>

**I.   PLEADING STANDARDS**

**A.   Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6)[5]**

In deciding a motion to dismiss under Rule 12(b)(6), this Court must accept all well-
pleaded allegations contained in the complaint as true, and it must draw all reasonable inferences
in favor of the plaintiff.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  A
plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6)
motion, *id.* at 570, but the "[f]actual allegations must be enough to raise a right to relief above
the speculative level, on the assumption that all of the allegations in the complaint are true."  *Id.*
at 555 (citation omitted).  Therefore, this standard "demands more than an unadorned, the-
defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible
on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  By contrast, "[a] pleading that offers 'labels
and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor
does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual
enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555) (citations omitted).  If a plaintiff "ha[s]
not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be
dismissed." *Twombly*, 550 U.S. at 570.

---

[5] The standard for ordering re-pleading under Federal Rule of Civil Procedure 12(e) is discussed
below in Section II.

**B.      Claims under the Securities Exchange Act of 1934 (the "Exchange Act")**

To state a claim under Section 10(b) of the Exchange Act, Plaintiff must adequately plead "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).  Plaintiffs' allegations must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b), which require that complaints alleging fraud plead *particular facts* establishing the "who, what, when, where, and how" (*i.e.*, "how" the challenged statements misled the plaintiff) of the alleged fraud.  *Id.* at 1237.

In addition, Plaintiff also must meet certain heightened pleading requirements imposed by the Private Securities Litigation Reform Act (the "PSLRA").  First, the PSLRA requires that Plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Second, while state of mind may be generally averred under Rule 9 for other types of fraud, the PSLRA requires that "with respect to each act or omission alleged to violate this chapter, [Plaintiff must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

Where, as here, a complaint fails to satisfy any one of the heightened pleading requirements imposed by the PSLRA, it must be dismissed. 15 U.S.C. § 78u-4(b)(3).

**C.      Claims under the Securities Act of 1933 (the "Securities Act")**

"Section 11 of the Securities Act creates a cause of action against persons preparing and signing materially misleading registration statements. A registration statement can be misleading either by containing an untrue statement or by omitting facts that are necessary to prevent other statements from being misleading."  *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (internal citations omitted).  "There is no state of mind element to a § 11 claim."  *Id.*  However, the Eleventh Circuit has held that where, as here, "the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10(b)–5," the allegations must meet the particularity requirements of Rule 9(b).  *Id.*  The fact that Plaintiffs here attempt to disclaim fraud in

association with the Securities Act claim is of no moment.  *Id.* at 1278 ("Nor is it enough to present a general disclaimer in an attempt to immunize the nonfraud claims from the Rule 9 requirements, for the same common sense reasons. The purpose of the rule is to protect a defendant's good will and reputation when that defendant's conduct is alleged to have been fraudulent.").

## II.    THE COMPLAINT IS AN IMPROPER SHOTGUN PLEADING

The Complaint is a shotgun pleading, and, if it is not dismissed, Plaintiffs should be ordered to re-plead pursuant to Federal Rule of Civil Procedure 12(e).  A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  To that end, Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim" showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  Complaints that violate Rule 8(a)(2) are disparagingly referred to as shotgun pleadings, and the Eleventh Circuit has held that district courts should, *sua sponte*, order re-pleading of such complaints under Rule 12(e).  *Wagner*, 464 F.3d at 1280 (holding that trial court should have, *sua sponte*, ordered re-pleading of shotgun pleading asserting violation of the Securities Act and the Exchange Act).

Shotgun pleadings may violate Rule 8(a)(2) in several ways, including by "incorporate[ing] every antecedent allegation by reference into each subsequent claim for relief…." *Id.* at 1279.  They may also violate Rule 8(a)(2) by incorporating factual allegations that are not relevant to a particular count and leaves the reader to "speculate as to which factual allegations pertain to which count." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1359 n. 9 (11th Cir. 1997) (referring to this as an "all-too-typical shotgun pleading").  Finally, a complaint that includes numerous paragraphs of allegations that are not "material to any of the causes of action" and requires the defendant and the district court to "sift through the facts presented and decide for themselves which were material to the particular cause of action asserted, a difficult and laborious task indeed" is also an improper shotgun pleading.  *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991).  These shotgun pleadings "exact an intolerable toll on the trial court's docket, lead to unnecessary and unchannelled discovery, and impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and resources." *Cramer v. State of Fla.*, 117 F.3d 1258, 1263 (11th Cir. 1997).

Here, at 77 pages and 240 paragraphs (with over 50 subparts), the Complaint is hardly the "short and plain statement of the claim" required by Rule 8(a)2.  It is instead an especially offensive shotgun pleading that hits all three bases: incorporation of "each and every" paragraph; incorporation of mass, general allegations (even incorporation upon incorporation); and incorporation of nonmaterial allegations.

First, Plaintiffs' Third Claim (Violation of Section 10(b) of the Exchange Act) and Fourth Claim (Violation of Section 20(a) of the Exchange Act) "repeat and re-allege each and every allegation contained above as if fully set forth herein." (*See* Complaint at ¶¶ 226 & 237.)  What follows each incorporation by reference are boilerplate, conclusory statements that generally track the elements of a securities fraud claim.  This is the "proverbial shotgun pleading," which "wreak[] havoc on the judicial system" and "divert[s] already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." *Wagner*, 464 F.3d at 1279.

Plaintiff's First Claim (Violation of Section 11 of the Securities Act) and Second Claim (Violation of Section 15 of the Securities Act), on the other hand, combine the other types of shotgun pleadings when they "repeat and re-allege the allegations contained in ¶¶ 1-147, 203-211, above as if fully set forth herein." (*See* Complaint at ¶¶ 212 & 218.)  Although in a transparent and ineffective attempt to avoid Rule 9(b)[6] (*see* Section I.C.), Plaintiffs do not incorporate Paragraphs 148-202, which fall under the heading "VI Violations of the Exchange Act," Plaintiffs still incorporated 135 paragraphs, some of which allege facts that post-date the IPO and likely have nothing to do with the Securities Act claims.  (*See, e.g.*, Complaint at ¶¶ 62-71, 97-102.)  This improperly leaves Defendants and the Court to "sift through the facts presented and decide for themselves which [are] material to the particular cause of action…." *Pelletier*, 921 F.2d at 1518 ("a difficult and laborious task indeed").[7]

As the Eleventh Circuit has stated, the prohibition against shotgun pleadings is particularly important in a securities fraud action, such as this, asserting claims under both the Securities Act and the Exchange Act with the applicable heightened pleading requirements under Rule 9(b) and the concerns of abusive litigation expressed by Congress in the PSLRA.  As stated

---

[6] Plaintiffs also incorporated this disclaimer of fraud into their fraud-based Exchange Act claims. (*See* Complaint at ¶¶ 226 & 237.)

[7] Plaintiff's Complaint is even worse still because it has incorporation upon incorporation. (*See, e.g.*, Complaint at ¶¶ 147, 150, 154, 169-172.)

in *Wagner*, with such "insufficiently detailed" counts where the "elements of these claims are also insufficiently linked to the large fact section that proceeds the counts," Plaintiffs have not "connected their facts to their claims in a manner sufficient to satisfy Rule 9(b)" in the case of the Securities Act claim and both Rule 9(b) and the PSLRA in the case of the Exchange Act claim. *Wagner*, 464 F.3d at 1279-80; *see also, id.* at 1279 (this kind of pleading does not permit the district court to fulfill its "gatekeeping function" and "determine whether Plaintiffs' claims are meritorious or precisely the kind of abusive litigation Congress sought to prevent").

The Complaint is a shotgun pleading, and Plaintiffs should be ordered to re-plead pursuant to Rule 12(e). *Wagner*, 464 F.3d at 1280 (district court should order re-pleading of shotgun complaint).

## III.   THE COMPLAINT ALLEGES MISMANAGEMENT, NOT SECURITIES FRAUD

"The Supreme Court has observed that Congress by Section 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement and that allowing mismanagement claims to proceed under 10b-5 would pose a danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5." *Carvelli v. Ocwen Fin. Corp.*, 9:17-CV-80500-RLR, 2018 WL 4941110, at *7 (S.D. Fla. Apr. 30, 2018) (internal punctuation omitted) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478–79 (1977)). Although the Supreme Court only addressed Exchange Act claims in *Santa Fe*, the principle applies equally well to Securities Act claims. *See Drucker v. Just for Feet Inc.,* CV 97-B-1578-S, 2000 WL 36733071, at *6 (N.D. Ala. Sept. 29, 2000) (citing *Santa Fe* and dismissing Securities Act claims premised on failure to disclose inappropriate method of accounting); *see also In re Craftmatic Sec. Litig.*, 890 F.2d 628, 640 (3rd Cir. 1989) (dismissing Securities Act claim based on alleged failure of management to characterize its financial reporting and accounting controls as inadequate and ineffective because "where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts").

Plaintiffs' allegations that management failed to disclose weaknesses in financial reporting and disclosure controls and made accounting errors (Statements 1-12, 16-17 & 19-21) are no more than allegations of corporate mismanagement, not securities fraud, and should be dismissed. (*See, e.g.*, Complaint at ¶ 158b-c (stating that Alfi did not have "a sufficient complement of personnel commensurate with the accounting and reporting requirements of a

13

public company" and did not have the "necessary personnel to design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company").

The same is true for the alleged misstatements regarding the purchase of the condominium (Statement 18) and the alleged announcement of the stock buyback one day prior to formal Board approval (Statement 15). Alfi disclosed the purchase of the condominium in its quarterly financial reporting and later sold it, and the stock buyback did, in fact, take place. (*See* Complaint at ¶¶ 163 & 168.)

Finally, the statements regarding the number of rideshare drivers signed up or waiting for tablets (Statements 13-14) are, at most, merely an allegation of corporate mismanagement. (Complaint at ¶ 161.) As the Investigation determined, that number of rideshare drivers had, in fact, expressed interest in receiving Alfi tablets at that time. (*Id.*) While Plaintiffs accuse Mr. Pereira of not being "organized enough" to read a spreadsheet that allegedly tracked both drivers that had expressed interest and those that had actually signed contracts with Alfi, that too is at most an allegation of mismanagement, not securities fraud. (Complaint at ¶¶ 179-80.)

## IV.  THE EXCHANGE ACT CLAIM FAILS

### A.  The Complaint fails to allege a strong inference of scienter

As stated above, the PSLRA raised the standard for pleading scienter. *Mizzaro*, 544 F.3d at 1238. "[I]n a securities fraud class action, a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." *Id.* In addition, "[a] motive or opportunity to commit fraud, without more, is not sufficient to establish scienter." *In re Royal Caribbean Cruises Ltd. Sec. Litig.,* 1:11-22855-CIV, 2013 WL 3295951, at *10 (S.D. Fla. Apr. 19, 2013). Instead, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). That state of mind for a § 10(b) and Rule 10b-5 claim under the Exchange Act is an "intent to deceive, manipulate, or defraud" or "severe recklessness." *Mizzaro, Inc.*, 544 F.3d at 1238. The Eleventh Circuit has defined "severe recklessness" in this context as follows:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.*

The Supreme Court has held that a "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007)). "In sum, the reviewing court must ask:  When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc.,* 551 U.S. at 326.  This standard in some respects is more challenging for a plaintiff to meet than the test under Rule 56 for summary judgment because it asks not what a reasonable person "could think" but, instead, what a reasonable person "would think." *Mizzaro,* 544 F.3d at 1239.  "[T]he inquiry is 'inherently comparative' because courts 'must take into account plausible opposing inferences.'"  *Id.* at 1239 (quoting *Tellabs, Inc*. 551 U.S. at 323). "[T]he inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs, Inc.* 551 U.S. at 324. While courts should look at the complaint in its entirety in making this determination, "the complaint must allege facts supporting a strong inference of scienter for *each defendant* with respect to *each violation*."  *Mizzaro,* 544 F.3d*.* at 1238 (emphasis added).

As the Eleventh Circuit stated in *Mizzaro* to reinforce how difficult it is for a plaintiff to allege scienter under this standard:

> Fearing that these types of lawsuits were "injur[ing] the entire U.S. economy" by rewarding "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) (quotation marks omitted), Congress decided to open the courthouse doors only to those plaintiffs whose complaints raised a "strong inference" that the defendants they sought to hold responsible for their losses acted with the required bad intent.  And the Supreme Court has unambiguously explained to us that the "strong inference" requirement, though not insurmountable, is difficult to meet—the inference must be cogent and at least as compelling as any opposing inference.

*Id.* at 1257.

Plaintiffs' allegations here fall woefully short of this exacting standard.  Plaintiffs merely state in conclusory fashion:

> Each of the statements and omissions identified below (in this Section VI.A) as false and/or misleading was made with scienter because Alfi and the Individual Defendants knew and/or recklessly disregarded that their statements were false

and/or misleading and/or omitted material information required to be stated therein
to make their statements not misleading.

(Complaint at ¶ 149.)  This conclusory and general allegation of scienter does not meet the
standard imposed by Congress—or even *Iqbal* and *Twombly*—and must be disregarded by the
Court.  *See In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1349 (M.D. Fla.
2007) ("The Eleventh Circuit has followed *Tellabs* and added that merely alleging scienter in
general, conclusory terms does not meet the particularity requirement.") (internal quotations
omitted); *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336,
1360 (S.D. Fla. 2015) ("to the extent that Plaintiffs rely on conclusory allegations without any
supporting factual allegations, those allegations are insufficient to support a finding of scienter
and they too will be disregarded").

Plaintiffs' conclusory statement also fails to comply with the PSLRA and Rule 9(b)
because it improperly lumps all of the defendants together.  *See Thorpe v. Walter Inv. Mgmt.,
Corp.*, 1:14-CV-20880-UU, 2014 WL 11961964, at *16 (S.D. Fla. Dec. 23, 2014) ("Instead of
separately alleging facts giving rise to a strong inference of scienter for each defendant, Plaintiffs
improperly refers to them as the "Individual Defendants" or together with Walter Investment as
the "Defendants." This is insufficient under Rule 9(b) and the PSLRA, which requires Plaintiffs
to allege what each Defendant knew, how the Defendant knew that information and when each
Defendant knew or should have known that information."); *City of St. Clair Shores Gen.
Employees' Ret. Sys. v. Lender Processing Servs., Inc.*, 3:10-CV-1073-J-32JBT, 2012 WL
1080953, at *4 (M.D. Fla. Mar. 30, 2012) ("Scienter must be alleged with respect to each
defendant and with respect to each alleged violation. Because Plaintiff's Complaint does not do
so, it will be dismissed without prejudice.") (internal citation omitted).

Plaintiffs then assert supposed "Additional Allegations Regarding Defendants' Scienter"
in an ineffective attempt to bolster their conclusory statement.  First, Plaintiffs allege that it was
alleged in another lawsuit from 2016 involving a different company that Defendant Pereira
"engaged in a brazen pattern of improper conduct and self-dealing designed to enrich Pereira…"
(Complaint at ¶¶ 173-76.)  These unproven and unverified allegations from another lawsuit that
was voluntarily dismissed are not factual allegations that can be taken as true for the purposes of
showing a strong inference of scienter.  *See Fidel v. Rampell*, 02-61258-CIV-MARRA, 2005
WL 5587454, at *7 (S.D. Fla. Mar. 29, 2005) ("Nor does the naming of Pearlman in an unrelated

securities case create a[n] inference of scienter regarding his actions at Unapix, especially since Plaintiffs have not alleged there was a finding of wrongdoing in that unrelated case.")  In addition, that action also appears to have nothing in common with the allegations asserted here and should be disregarded for that reason as well.  *See id.* ("even if a finding of wrongfulness was alleged [in the other lawsuit], the Court cannot conclude that those allegations are therefore relevant to claims of reckless conduct in the instant case").

Plaintiffs also allege that Defendant Pereira stated during a different, earlier interview with Benzinga on June 2, 2021, that he was uncertain whether he could share information regarding kiosks in a particular store and potential plans to put kiosks in malls and that this somehow supports an inference of scienter.  (Complaint at ¶¶ 177-78.)  This does nothing to establish a strong inference that Mr. Pereira acted with an intent to mislead or severe recklessness as to the misrepresentations alleged by Plaintiffs.  There are no claims that Mr. Pereira shared confidential information or announced a contract with a customer prematurely or that any such statement was inaccurate.

Finally, Plaintiffs allege that Defendant Pereira likely knew that the number of rideshare drivers "signed up" for tablets was less than he stated because, according to a confidential witness who "mostly reported" to someone other than Mr. Pereira, it was all tracked in one spreadsheet.  (Complaint at ¶¶ 179-181.)  However, this same confidential witness purportedly asserts that she was not sure whether Mr. Pereira was "organized enough" to read this spreadsheet.  (*Id.*)  While this might suggest negligence, this is not enough to establish a "strong inference" of intent to mislead or severe recklessness.  *See Royal Caribbean*, 2013 WL 3295951, at *18 ("The weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case.") (quoting *Mizzaro*, 544 F. 3d at 1239-40).[8]

_____

[8] Regardless, as set forth below, Plaintiffs fail to allege any loss causation for that alleged misrepresentation because when it was disclosed, the stock price went up.  (*See* Section III.B.i.) And nothing from this confidential witness would permit a strong inference of scienter as to any other alleged misrepresentations.  *See Mizzaro,* 544 F.3d. at 1238 ("the complaint must allege facts supporting a strong inference of scienter for *each defendant* with respect to *each violation*") (emphasis added); *see also FindWhat Inv'r Grp.*, 658 F.3d at 1300 ("although the Plaintiffs are correct that the court's inquiry is a holistic one and that factual allegations may be aggregated to infer scienter the district court was correct to analyze scienter separately with respect to each allegedly false statement.") (internal punctuation and citations omitted).

Because the Complaint fails to allege facts supporting a strong inference of scienter, the Exchange Act claims must be dismissed.

**B.      The Complaint fails to allege loss causation**

A plaintiff must also plead that its claimed economic losses were proximately caused by defendants' allegedly false or misleading statements, rather than the multitude of other factors that affect a stock's price. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-48 (2005); *id.* at 345-46 (Congress "expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'"); *id.* at 345 (the securities laws are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause").  As stated by the Eleventh Circuit:

> Plaintiffs frequently demonstrate loss causation circumstantially, by: (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

*Meyer v. Greene,* 710 F.3d 1189, 1196-97 (11th Cir. 2013) (affirming dismissal for lack of loss causation) (quoting *FindWhat Inv'r Grp.,* 658 F.3d at 1311–12).  Accordingly, the Eleventh Circuit has framed the inquiry as: "even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?" *Id.*  "[G]eneralized, vague or overbroad allegations regarding the existence of a disclosure or revelation of fraud that is merely alleged to have been connected to a drop in stock price will not suffice to put a defendant on notice of loss causation claims." *In re TECO Energy, Inc. Sec. Litig.*, 8:04-CV-1948-T-27EAJ, 2006 WL 845161, at *2 (M.D. Fla. Mar. 30, 2006).

Plaintiffs here allege four purported "corrective disclosures" in an attempt to allege loss causation.  They are not corrective disclosures for the reasons set forth below.

**i.      The October 28, 2021 Form 8-K**

First, Plaintiffs allege that an October 28, 2021 Form 8-K filed by Alfi constitutes a corrective disclosure when they state:

> On October 28, 2021, after the close of market, Alfi announced that on October 22, 2021, the Board had placed Defendant Pereira, Defendant McIntosh, and Charles Pereira on paid administrative leave and authorized an "independent internal investigation regarding certain corporate transactions and other matters." Alfi further announced that on October 28, 2021, Charles Pereira's employment with the Company was terminated. On this news, the Company's shares fell $1.24, or approximately 21.91%, to close at $4.42 on October 29, 2021, on unusually heavy trading volume.

(Complaint at ¶¶ 188-89.)  Plaintiffs do not even attempt to demonstrate how this alleged corrective disclosure "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by the company's fraud."  *Meyer*, 710 F.3d at 1196.  And Defendants should not be left to speculate. *Dura Pharm., Inc.*, 544 U.S. at 347 ("allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes [*i.e.*, the PSLRA] seek to avoid").

Moreover, it is clear that nothing in the October 28, 2021 From 8-K revealed the truth of any alleged misrepresentations.  (*See, generally,* Ex. 4.)  This disclosure merely states that Defendant Pereira and Defendant McIntosh had been put on paid administrative leave and that the Board had "authorized an independent internal investigation regarding certain corporate transactions and other matters."  (*Id.* at 2/3.)  "But a corrective disclosure must "reveal[] to the market the falsity of [a] prior misstatement[ ]."  *Meyer*, 710 F.3d at 1200.  Nothing in this Form 8-K reveals to the market the falsity of alleged prior misrepresentations.  Nor did this disclosure identify what was being investigated.  It merely informed the market that the Board had authorized an internal investigation.  "The announcement of an investigation reveals just that— an investigation—and nothing more."  *Meyer*, 710 F.3d at 1201.  Accordingly, this Form 8-K cannot serve as a corrective disclosure to satisfy Plaintiffs' burden of alleging loss causation.

In addition, it is glaring that while Plaintiffs include in their general allegations other, more pertinent, disclosures that provide detail regarding the Investigation and the findings of the Investigation, they purposefully omit such disclosures from their allegations of loss causation.  (*See* Complaint at ¶¶ 185-97.)  This is because when detail regarding the scope of the Investigation was disclosed on November 1, 2021 (*i.e.*, the purchase of the condominium and the sponsorship of the sporting event), ***Alfi's stock price went up for the next four days for a gain of 18.5%***.  (*See* Ex. 5 at 5/6; Ex. 3a at 4.)  And when the results of the independent investigation were revealed on February 23, 2022, and actually did disclose finding regarding many of the

alleged misrepresentations, ***the stock price again went up for the next three trading days for a 62% gain.***  (*See generally* Ex. 4; Ex. 3a at 6.)

Plaintiffs simply cannot meet their burden of alleging loss causation when the stock price went up after the alleged fraud was revealed.  *See In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 16-CV-60165-WPD, 2016 WL 10592320, at *5 (S.D. Fla. June 6, 2016) (granting motion to dismiss) (citing *Waters v. Gen. Elec. Co.*, No. 08 CIV. 8484 RJS, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) ("The Court cannot find, and Plaintiffs have not cited, a single Section 10b–5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud.")).

In the end, Plaintiffs' Complaint is exactly what the Supreme Court was concerned about when it held that a plaintiff must properly allege loss causation.  *See Dura Pharm., Inc.*, 544 U.S. at 347 (stating that if plaintiffs were not required to plead loss causation, it would "tend to transform a private securities action into a partial downside insurance policy" and "permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence") (internal punctuation omitted).

### ii.      The November 15, 2021 Form 8-K

Second, Plaintiffs allege that a November 15, 2021 Form 8-K filed by Alfi constitutes a corrective disclosure when they state:

> On November 15, 2021, after the market closed, Alfi announced that on November 9, 2021, the Company received a letter from the SEC notifying Alfi that all documents and data should be "reasonably preserved until further notice" because "the Company, its affiliates and agents may possess documents and data relevant to an ongoing investigation being conducted by the staff of the SEC."

(Complaint at ¶ 190.)  Plaintiffs allege that following this disclosure and the disclosure discussed below, filed on November 16, 2021, "Alfi's stock price fell $0.24, or 5.21%, to close at $4.37 per share on November 16, 2021."  (*Id.* at ¶ 192.)

This disclosure, however, suffers from the same flaw as the October 28, 2021 "disclosure" discussed above: it does not "reveal[ ] to the market the falsity of [a] prior misstatement[ ]."  *Meyer*, 710 F.3d at 1200.  Instead, it simply reveals the existence of an investigation by the SEC and that the SEC asked Alfi to preserve documents.  (*See* Ex. 6 at 2/4.)

Again, "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." *Meyer*, 710 F.3d at 1201.  Therefore, this is not a corrective disclosure that could show loss causation for any alleged misrepresentations.

### iii.        The November 16, 2021 Form 8-K

Third, Plaintiffs allege that a Form 8-K filed by Alfi on November 16, 2021, constitutes a corrective disclosure when they state:

> Also, in a separate filing with the SEC accepted after the close of market on November 15, 2021 and filed on November 16, 2021, Alfi stated that it was unable to timely file its quarterly report on Form 10-Q for the period ended September 30, 2021 due to the recent changes in its executive management and Board and Alfi not yet engaging a new independent public accounting firm to review the 3Q 2021 financials.

(Complaint at ¶ 191.)  Plaintiffs allege that following this disclosure (and the disclosure discussed above filed on November 15, 2021), "Alfi's stock price fell $0.24, or 5.21%, to close at $4.37 per share on November 16, 2021."  (*Id.* at ¶ 192.)

Here, again, the disclosure does not "reveal[] to the market the falsity of [a] prior misstatement[ ]." *Meyer*, 710 F.3d at 1200.  All that Plaintiffs allege this Form 8-K revealed is that because of a transition in management and the need to retain a new independent auditor, Alfi did not expect to timely file its Form 10-Q.  Therefore, this Form 8-K cannot qualify as a corrective disclosure for any alleged misrepresentations.[9]

### iv.        The March 11, 2022 Form 8-K

Finally, Plaintiffs allege the following regarding a Form 8-K filed by Alfi on March 11, 2022:

> On March 11, 2022, after the close of market, Alfi announced that the Company's previously issued audited results for the years ended December 31, 2019 and 2020,

---

[9] Moving Defendants note, however, that this Form 8-K did disclose that Alfi still had not earned any significant revenues, reporting that "[f]or the three-month period ended September 30, 2021, the Company expects to report net revenues of $112, compared to net revenues of $936 for the three-month period ended June 30, 2021."  (Ex. 7 at 3.)  Alfi's reporting of its failure to generate any substantial revenues is the more probable reason for the price decline, and Plaintiffs have not alleged sufficient facts to "eliminate[]" this "possible explanation[] for this price drop." *Meyer*, 710 F.3d at 1196-97 (describing element number three of loss causation founded upon a corrective disclosure as "eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price drop").

> included in Alfi's Registration Statement, and the Company's previously issued quarterly financial statements on Form 10-Q for the quarterly periods ended March 31, 2021 and June 30, 2021 should no longer be relied upon and should be restated.

(Complaint at ¶ 193.)  The Complaint goes on to allege that Alfi expected to restate various line items from its prior financial statements and provided estimates of the same and stated that Alfi "expected to conclude that material weaknesses in its internal controls over financial reporting for the periods covered by these accounting errors and that Alfi's disclosure controls and procedures for such periods were not effective." (*Id.* at ¶¶ 194-96.)  Plaintiffs further allege that "[o]n all this news, Alfi's stock price fell $0.13, or 8.075%, to close at $1.48 per share on March 14, 2022, the first trading day after this news was released." (*Id.* at ¶ 197.)

While this Form 8-K did identify alleged accounting errors, this Form 8-K still fails to show loss causation because, as discussed below, the stock price had a rapid and sustained recovery and gain after the initial, modest drop.  *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (holding that plaintiff could not rely on alleged corrective disclosure to show loss causation where the stock price initially dropped but then recovered shortly thereafter).

In *Wochos*, while Tesla had stated that it had begun automated production of Model 3s in August 2017, on October 6, 2017, the Wall Street Journal reported after hours that Model 3s were still being made by hand, and the automated production line still was not ready.  *Id.*  The next day, the stock price fell from $356.88 to $342.94.  *Id*. The plaintiffs alleged that the Wall Street Journal article was a corrective disclosure and tried to rely upon the stock drop from October 7 to show loss causation.  *Id.* The Ninth Circuit rejected this argument, however, because Tesla's stock "immediately rebounded, closing at $355.59 on October 10 and trading between $350 and $360 over the next week." *Id.* ("The quick and sustained price recovery after the modest October 9 drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price.").[10]

_____

[10] The Moving Defendants note that another Circuit Court of Appeals may have come to a different conclusion on the question of whether loss causation can be shown in association with an alleged corrective disclosure where the stock initially drops but then quickly recovers.  *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012).  It does not appear the Eleventh Circuit has squarely addressed the issue, and the Moving Defendants submit that the Ninth Circuit's holding is more consistent with Congress's concerns when enacting the PSLRA and "impos[ed] on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'"  *Dura Pharm., Inc.* 544 U.S. at 345-46 (quoting 15 U.S.C. § 78u-4(b)(4)).

Similarly, here, although Alfi's stock dropped from $1.61 to $1.48 on the next trading day (March 14) following the March 11, 2022 Form 8-K, it immediately recovered on March 15, 16 & 17 and closed at $1.80 per share on March 17 for a ***total gain of 11.8%*** and never again closed below $1.61 until weeks later on April 8, 2022.  Like in *Wochos*, this "quick and sustained price recovery after the modest [March 14] drop refutes the inference that the alleged concealment [of the facts revealed] caused any material drop in the stock price."  *Wochos*, 985 F.3d at 1198.

Because Plaintiffs have failed to allege loss causation, the Exchange Act claims must be dismissed.

### C.      The Complaint does not specify why each alleged misstatement is misleading

As set forth above, the Exchange Act claims fail because Plaintiffs do not plead scienter or loss causation.  However, Plaintiffs also fail to properly allege why each alleged misstatement is misleading.  Under the heightened pleading standards of the PSLRA, a plaintiff must "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78-u-4(b)(1).  If a plaintiff fails to do so, "the court shall, on the motion of any defendant, dismiss the complaint," 15 U.S.C. § 78u-4(b)(3)(A).  To that end, "[t]he Eleventh Circuit requires Plaintiff to isolate each statement alleged to be false and explain why it is false."  *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d at 1346 (citing *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir.2006)).  A plaintiff's "failure to isolate each statement alleged to be false and explain why it is false is itself a basis to dismiss [the complaint]."  *Hoffman v. Authentec, Inc.*, 608CV-1741-ORL-28DAB, 2009 WL 3109860, at *12 (M.D. Fla. Sept. 24, 2009); *see also Tabor v. Bodisen Biotech, Inc.,* 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("Plaintiffs' use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements.")

Here, Plaintiffs fail to provide the required particularity when identifying the allegedly false statements and the reason why each statement is misleading.  For example, at Paragraphs 140-143, Plaintiffs set forth multiple alleged misstatements (Statements 1-4)[11] and then improperly addresses the alleged falsity of all those alleged misstatements in the *nine* subparts to

---

[11] The reference to the "Statement" numbers herein is to the chart at Exhibit 10 to this Motion and the categories described on pages 8-9 of this Memorandum.

Paragraph 144 that go on for *two pages*.  Plaintiffs set forth two additional alleged misstatements in ¶¶ 145-146 (Statements 5-6) and then improperly address the alleged falsity of those statements by both incorporating all *nine* subparts of Paragraph 144 but also then relying on all *five* subparts of Paragraph 147 that go on for over a page.  Plaintiffs do the same thing for Statements 7-9 (¶¶ 151-154), Statements 10-12 (¶¶ 155-158), Statements 16-17 (¶¶ 164-166), and Statements 19-21 (¶¶ 169-172).  Statements 10-12 are particularly egregious because they improperly use large block quotes from filings, and Statements 16-17 are even worse in that they then incorporate and refer back to those block quotes.  This falls woefully short of meeting Plaintiffs' "dual burden of providing sufficient particularity as to the fraud while maintaining a sense of brevity and clarity in the drafting of the claim, in accord with Rule 8." *Wagner*, 464 F.3d at 1278.  Any claims resting on these allegations should be dismissed.

While Plaintiffs made more specific allegations regarding other alleged misstatements, those allegations still fail.  Statement 15 wherein Benzinga reported that Alfi was conducting a buyback was not false because Alfi did, in fact, conduct a buyback. (Complaint at ¶¶ 162-163.) And Statement 18 wherein Alfi disclosed the purchase of the condominium also was not false because Alfi did in fact purchase the condominium and later sold it.  (*Id.* at ¶ 167-168.)  Finally, Mr. Pereira's statement that 22,000 rideshare drivers were "signed up waiting for deployment of Alfi tablets" and Alfi's press release stating 22,000 rideshare drivers were "waiting on installation of Alfi screens" were also not false because, as Plaintiffs acknowledge, that number of rideshare drivers had in fact expressed interest and were therefore waiting on installation of Alfi screens.  (*Id.* at ¶¶ 159-161.)  Neither Mr. Pereira nor Alfi ever stated that 22,000 rideshare drivers had entered into contracts with Alfi.

### D.    The alleged misstatements are not material

Plaintiffs also fail to allege that the misstatements are material.  A "misrepresentation or omission is material if, in the light of the facts existing at the time, a reasonable investor, in the exercise of due care, would have been misled by it." *Carvelli v. Ocwen Fin. Corp.*, 934 F. 3d 1307, 1317 (11th Cir. 2019) (internal punctuation omitted).  "In other words, materiality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the 'total mix' of information made available.'" *Id.*  Nowhere in the Complaint do Plaintiffs attempt to shoulder the burden of

connecting the dots and stating in compliance with the pleading standards how any of the alleged misstatements meet this test.

With regard to the alleged accounting errors and GAAP violations (Statements 1-12, 16-17 and 19-20), the law is clear that allegations of an accounting error or GAAP violation standing alone is not enough to assert a securities fraud claim. *See, e.g., In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1279 (S.D. Fla. 2017) ("In the Eleventh Circuit, however, allegations of violations of ... GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b).") (internal quotations omitted).  Plaintiffs' allegations (and the market's reaction to the disclosure of the errors) show that these alleged errors were not material.

First, Plaintiffs make no attempt to show how the failure to recognize an office lease in accordance with GAAP was material.  (*See, e.g.*, Complaint at ¶ 144i.)  Plaintiffs similarly make no attempt to show how the recording of the unfunded portion of a $2,000,000 bridge loan totaling $1,830,000 as both a note payable and note receivable in a manner that overstated ***both*** assets and liabilities ***in equal amounts*** could be material.  (*See, e.g., id*. at ¶ 144h.)  In any event, this was all disclosed in the Registration Statement.  *See Drucker*, 2000 WL 36733071, at *4 (granting motion to dismiss and rejecting argument that allegedly improper accounting treatment in registration statements was material where the accounting methodology and amounts were disclosed).

To that end, in Note 5 "Notes Payable – Related Party" to the "Notes to the Consolidated Financial Statements," Alfi disclosed: (1) the $2,000,000 bridge loan; (2) that as of December 31, 2020, $170,000 had been funded; and (3) that $1,830,000 remained unfunded.  (A copy of the final amendment to the S-1 is attached hereto as Exhibit 11 (*see* page F-15).)  And under Note 13 "Note Receivable Related Party," Alfi disclosed the other side of this entry, stating:

> During the twelve months ended December 31, 2020, the Company incurred a related party note receivable associated with its bridge loan (see Note 5) for $1,830,000. The related party note receivable was paid in full to the Company in January 2021, but is reflected as a note receivable as of December 31, 2020. Balance of the related party note receivable at December 31, 2020 and 2019 was $1,830,000 and $-0-, respectively.

(*Id.* at F-21.)

The same is true for the alleged error in how Alfi accounted for its tablets.  While subsequent management later determined it was not appropriate to report Alfi's tablet inventory

at cost (Complaint at ¶ 106b), this purportedly improper accounting treatment was disclosed under "Note 3 Significant Accounting Policies – Continued" under "Complimentary Devices." (*See* Ex. 11 at F-10 (stating that Alfi records tablets "at the lower of cost or fair market value… [and] [d]evices are accounted for as Other assets (complimentary devices) on the consolidated balance sheet until they are provided to a rideshare… [and] [u]pon being placed into service for consumer use, [Alfi] expenses Other assets (complimentary devices) to Cost of Sales").[12]

Finally, while subsequent management determined that Alfi had incorrectly capitalized certain general and administrative expenses by recording them in intangible assets, Alfi disclosed that it "recognizes amortizable intangible assets associated with the costs to acquire or costs to complete its technology development projects." (*Id.*)[13]

The disclosure by Alfi of these facts and challenged accounting procedures "*fatally undermines* [P]laintiffs' contention that use of this accounting treatment forms the basis of a securities fraud claim." *Drucker*, 2000 WL 36733071, at *4 (emphasis added).

Further demonstrating the immateriality of these accounting errors, when the alleged errors were first disclosed to the market, Alfi's stock price initially fell modestly from $1.61 to $1.48, but it quickly recovered and then some on March 15, 16, and 17 to close at $1.80 per share on March 17, and it never again, *during the Class Period*, closed below its March 11 price of $1.61.  (Ex. 3a at 7.); *see Miyahira,* 2012 WL 12895513, at *7 ("statements that cause an insignificant change in stock price" are immaterial "as a matter of law").[14]  And when the final Restatements were made on May 16, 2022, outside of the Class Period, the stock price went up the next trading day.  (Ex. 3a at 8.)

The immaterial nature of these errors also dispenses with Plaintiffs' claims that these errors rendered various statements regarding compliance with GAAP or the adequacy of internal controls materially false (Statements 3-6, 8-12, 17, 19-21).  *See Drucker*, 2000 WL 36733071, at *4 (stating that such a claim would improperly make "any alleged deviation from GAAP that affects a company's reported financial results… per se actionable under the federal securities

---

[12] Similar disclosures are included in the June 10, 2021 Q1 2021 and August 16, 2021 Q2 2021 Form 10-Qs.  (*See* Ex. 1 at 9-10; & Ex. 2 at 8.)

[13] Similar disclosures are included in the June 10, 2021 Q1 2021 and August 16, 2021 Q2 2021 Form 10-Qs.  (*See* Ex. 1 at 10; & Ex. 2 at 9.)

[14] Indeed, this is true for all of the alleged misstatements because, as set forth above in Section IV.B, when the purported truth came out, Alfi's stock went up.

laws… [but]… violations of GAAP, standing alone, do not necessarily state a claim under the federal securities laws"); *id.* (defendants were not required to disclose that their accounting treatment was in violation of GAAP because "the federal securities laws [are] not a rite of confession… what is required is the disclosure of material objective factual matters").

The other alleged misstatements are immaterial for reasons in addition to the fact that the stock went up when they were disclosed.  Statement 15 regarding Benzinga's reporting that Alfi was planning a buyback is not material because, as alleged in the Complaint, Alfi, in fact, conducted the buyback.  Statement 18 regarding the purchase of the condominium is not material because, as alleged in the Complaint, Alfi did acquire the condominium and sold it.  Finally, Statements 13-14 regarding the number of rideshare drivers "signed up" or "waiting for deployment of Alfi tablets" are not material because they are, when taken in context, statements of growing demand and encouraging prospects of future earnings and therefore nonactionable corporate puffery.  *See Royal Caribbean*, 2013 WL 3295951, at *12 (finding statements regarding "healthy demand" the "intention to compete successfully" and the "'encouraging' prospect of early bookings" to be examples of corporate puffery).[15]

## V.   THE SECURITIES ACT CLAIMS FAIL

### A.   Alfi warned of the risk in the Registration Statement

Plaintiffs cannot recover for the alleged accounting errors and statements regarding the adequacy of controls in the Registration Statement because Alfi warned of the exact risk that allegedly materialized.  *See In re Greenlane Holdings, Inc. Sec. Litig.,* 511 F. Supp. 3d 1283, 1296 (S.D. Fla. 2021) (dismissing Section 11 claim where defendant "did warn potential investors about the risks"); *In re ProShares Tr. Sec. Litig.,* 728 F.3d 96, 102 (2d Cir. 2013) ("[W]hen a registration statement warns of the exact risk that later materialized, a section 11 claim will not lie as a matter of law.") (internal punctuation omitted); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019) (finding that statements regarding the adequacy of internal controls could not form the basis of a material misrepresentation where "the Prospectus disclosed both weaknesses in its internal controls and the risk that one of Sky's challenges in transitioning from a small, private company to a public corporation was that

---

[15] In addition, as disclosed in Alfi's Registration Statement, contracts with rideshare drivers do not result in a payment to Alfi.  (Ex. 11 at F-9 ("The contract with a rideshare, mall or airport owner for placing a device in service will not provide for payment from such person to Alfi."))

continued weaknesses of such internal controls, which the creation of the audit committee and related-party review process were intended to address, put at risk Sky's ability to prevent fraud").

Here, Alfi warned in its Registration Statement:

The members of our management team have limited or no experience managing a publicly-traded company, interacting with public company investors, and complying with the increasingly complex laws, rules and regulations that govern public companies. There are significant obligations we will now be subject to relating to reporting, procedures and internal controls, and our management team may not successfully or efficiently manage our transition to being a public company.

(Ex. 11 at 17; *id.* at 18.) This is exactly what Plaintiffs' alleged happened. (*See, e.g.*, Complaint at ¶ 158b-c (stating that Alfi did not have "a sufficient complement of personnel commensurate with the accounting and reporting requirements of a public company" and did not have the "necessary personnel to design effective components of internal control, including risk assessment control activities information/communication and monitoring to satisfy the accounting and financial reporting requirements of a public company").) The Section 11 claim therefore fails.

### B. The alleged misstatements are not material

While a plaintiff need not allege scienter or loss causation (*but see* Section V.C. below concerning Defendants' "negative causation" defense) in support of a Section 11 claim under the Securities Act, a plaintiff must still allege facts showing that the misstatements are material (*i.e.*, that there is a "substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available"). *See Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1266 (11th Cir. 2013) (affirming dismissal of Section 11 claim where plaintiff failed to show misstatements were material); *In re ProShares Tr. Sec. Litig.*, 728 F.3d at 102 ("The materiality hurdle remains a meaningful pleading obstacle") (internal punctuation omitted); *id.* (the question is "would" a reasonable investor have viewed the information as altering the total mix of information and it is "not sufficient to allege that the investor might have considered the misrepresentation or omission important").

Here, Plaintiffs have failed to adequately allege that the statements they contend support this claim (Statements 1-6) are material for the same reasons argued above in Section IV.D.

**C.      Plaintiffs' alleged losses are not attributable to the alleged misstatements**

As Lead Plaintiff has acknowledged, "[t]he principle of *Dura* applies to losses under both Section 10(b) of the Securities Exchange Act of 1934 and Section 11 of the Securities Act of 1933."  (ECF No. 18 at 8 (citing *Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*, 8:04CV2561T-24EAJ, 2006 WL 547989, at *25 (M.D. Fla. Mar. 6, 2006).)  Under Section 11, however, loss causation is an affirmative defense.  15 U.S.C. § 77k(e).  This "affirmative defense of negative causation prevents recovery for losses that the defendant proves are not attributable to the alleged misrepresentation or omission in the registration statement."  (*Id.* (quoting *Hildes v. Arthur Andersen, LLP*, 734 F.3d 854, 860 (9th Cir. 2013).)  While this is an affirmative defense, "dismissal is appropriate where [as here] it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses." *Davidco Inv'rs, LLC*, 2006 WL 547989, at *25 (quoting *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 289 F.Supp.2d 429, 437 (S.D.N.Y.2003)).

As set forth above in Section IV.B.iv, because the stock price quickly recovered after the filing of the March 11, 2022 Form 8-K, there can be no "inference that the alleged concealment [of the facts revealed] caused any material drop in the stock price."  *Wochos*, 985 F.3d at 1198.  And the March 11, 2022 Form 8-K is the only time within the class period that the supposed misrepresentations alleged by Plaintiffs in support of their Securities Act claims (Statements 1-6) were revealed to the market.  Accordingly, Plaintiffs' alleged losses cannot be attributable to the alleged misrepresentations in the Registration Statement and dismissal is appropriate.

**D.      Plaintiffs' Section 15 control person claim fails**

Plaintiffs' Section 15 claim against these individual Moving Defendants is predicated on an underlying violation of Section 11. (Complaint at ¶ 225.)  Because Plaintiffs' Section 11 claim fails, Plaintiffs' Section 15 claim must also be dismissed.  *Miyahira*, 2012 WL 12895513 at *10 ("Plaintiffs' § 15 control person claims are predicated on an underlying violation of §§ 11 or 12(a)(2). 15 U.S.C. § 77o. Because Plaintiffs fail to establish an underlying violation of either of those provisions, their control person claims are dismissed.").

## <u>CONCLUSION</u>

Plaintiffs' Complaint should be dismissed for the reasons set forth herein.  In the alternative, because it is an improper shotgun pleading, Plaintiffs should be ordered to re-plead pursuant to Rule 12(e).

## <u>LOCAL RULE 7.1 CERTIFICATE</u>

Counsel for the Defendants identified below has conferred with Plaintiffs to resolve the issues raised in the request for a more definite statement and has been unable to do so.

Respectfully submitted:  August 12, 2022

**SMITH GAMBRELL & RUSSELL LLP**

*/s/ James H. Cummings*
James H. Cummings (FBN 27657)
Bank of America Tower, Suite 2600
50 North Laura Street
Jacksonville, FL 32202
Tel:  (904) 598-6127
Fax:  (904) 598-6300
jcummings@sgrlaw.com

Dan F. Laney (*pro hac vice*)
Austin J. Hemmer (*pro hac vice*)
1105 West Peachtree St. N.E., Suite 1000
Atlanta, GA 30309
Tel: (404) 815-3500
Fax: (404) 815-3509
dlaney@sgrlaw.com
ahemmer@sgrlaw.com

*Counsel for Defendants Alfi, Inc., John M. Cook, II, Peter Bordes, Jim Lee, Justin Elkouri, Allison Ficken, and Frank Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2022, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will automatically serve all counsel of record registered with the Court's CM/ECF system.

/s/ James H. Cummings
James H. Cummings (FBN 27657)
Smith, Gambrell & Russell, LLP
Bank of America Tower, Suite 2600
50 North Laura Street
Jacksonville, FL 32202
Tel:  (904) 598-6127
Fax:  (904) 598-6300
jcummings@sgrlaw.com

Dan F. Laney (*pro hac vice*)
Austin J. Hemmer (*pro hac vice*)
1105 West Peachtree St. N.E., Suite 1000
Atlanta, GA 30309
Tel: (404) 815-3500
Fax: (404) 815-3509
dlaney@sgrlaw.com
ahemmer@sgrlaw.com

*Counsel for Defendants Alfi, Inc., John M. Cook, II, Peter Bordes, Jim Lee, Justin Elkouri, Allison Ficken, and Frank Smith*

31